16 A.3d 365 (2011)
205 N.J. 493
STATE of New Jersey, Plaintiff-Appellant,
v.
R.T., Defendant-Respondent.
A-73 September Term 2009
Supreme Court of New Jersey.
Argued January 18, 2011.
Decided April 28, 2011.
Leslie-Ann M. Justus, Deputy Attorney General, argued the cause for appellant (Paula T. Dow, Attorney General of New Jersey, attorney).
Michael J. Confusione, Designated Counsel, argued the cause for respondent (Yvonne Smith Segars, Public Defender, attorney).
PER CURIAM.
The members of the Court being equally divided on whether the instruction on voluntary intoxication required a new trial (three members finding the error harmful, one finding it harmless, and two finding no error), the judgment of the Appellate Division is affirmed.
For affirmanceJustices LONG, LaVECCHIA, and ALBIN3.
For concurrence in part/dissent in partChief Justice RABNER1.
For dissentJustices RIVERA-SOTO and HOENS2.
Not participatingJudge STERN (temporarily assigned)1.
Justice LONG, concurring.
At issue in this appeal is the propriety of the trial court's issuance, sua sponte, of a voluntary intoxication instruction, over the objection of defense counsel who claimed that the instruction was unwarranted on the evidence and negatively impacted his trial strategy. Defendant was convicted of sexual offenses against a child and the Appellate Division, over a dissent, ordered a new trial based on the issuance of the charge. State v. R.T., 411 N.J.Super. 35, 53, 983 A.2d 1177 (App.Div.2009). The State appeals as of right. R. 2:2-1(a). The evidence in this case did not warrant a voluntary intoxication charge. Its issuance interfered with defendant's strategy and affected the fairness of his trial. I would therefore affirm.

I.
Defendant, Robert Trout,[1] was indicted on two counts of sexual assault, in violation of N.J.S.A. 2C:14-2(a)(1); two counts of *366 aggravated sexual assault, in violation of N.J.S.A. 2C:14-2(a)(7); and one count of endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4(a); committed between the dates of July 15, 1997, and June 30, 2003. The alleged victim of the charged crimes was defendant's nephew, Larry Trout (Larry), who lived with him during that period.

A.

Defendant's Statement
Prior to trial, defendant moved to suppress a recorded statement he had given to the police. The testimony at the suppression hearing was as follows: on June 2, 2004, defendant presented himself voluntarily at the Camden County Prosecutor's Office for an appointment at the Child Abuse Unit. The purpose of the appointment was to discuss allegations that had been made by Larry against defendant. Sergeant Aida Marcial and Investigator John Hunsinger conducted the interview.
Defendant was advised of Larry's allegations against him and received Miranda warnings. Defendant stated that he understood his rights and signed a waiver card. He denied Larry's claims and Investigator Hunsinger asked him if he would submit to a computer voice stress analyzer (CVSA). Defendant agreed and underwent the test. Subsequently, Investigator Hunsinger advised defendant that the CVSA indicated deceptive answers to two questions regarding penetration of Larry.[2]
According to Investigator Hunsinger, defendant renewed his denial of the allegations. Defendant then expressed his belief that if he had abused Larry it would have occurred while he was drinking. At the end of the interview, Investigator Hunsinger asked defendant if he would consent to an audiotaped statement. Defendant agreed and Investigator Hunsinger again issued Miranda warnings. Again, defendant waived his rights. Then, the following exchange occurred:
Q: [Defendant] we're talking about some allegations that [Larry] had made against you is that correct?
A: Yes.
Q: In your own words tell us about these allegations?
A: I'm suppose to had um had sex um, sexual intercourse with [Larry] I was touching his behind and private parts and results of me probably drunk, of me drinking and things that I'm very sorry for this happening and I think that is a very sick thing to do. And that a person like me would need counseling, I maybe need counseling to do something like this.
Q: You feel as though you [have a] drinking problem?
A: Yes I do[.]
Q: How long have you been drinking?
A: I've been drinking for approximately 15 to 20 years[.]
Q: How often would you drink?
A: Oh, um often, I drink beers, cans of beers and also I drink between 4 to 8 beers a day[.]
Q: And is that usually during the day or at night time?
A: Toward the evening, like mid day toward the evening[.]
Q: Would you consider[ ] yourself to get drunk or a nice buzz?

*367 A: Well I think it be a buzz but at times it must be [half] way drunk to sometime to that of that I'm (inaudible) got drunk.
Q: Um, you indicated that you had ah sexual intercourse with [Larry]?
A: I might have had sexual intercourse with him, yeah. I really can't remember so I might have been very intoxicated at the time.
Q: What leads you to believe that [you] may have had sexual intercourse with [Larry], if you can't remember?
A: Cause it's going to be a possibility of me doing that but like I said but being drunk remember but if he recalls then I must did[.]
Q: You know how many times this happened, or may have happened?
A: I can not recall at this moment.
Q: Do you ever, have you helped [Larry] go to the bathroom at night?
A: Many times[.]
Q: And how would you help him?
A: That. Ah how would I help him, I would um take, walk him to the bathroom and pull his um pajamas down and (inaudible) put his hands and my hand may touch his penis to make sure it aim to the toilet [bowl].
Q: Would these be nights when you['re] intoxicated?
A: Yes[.]
....
Q: Um at any time do you recall when you were in the bathroom with him and he had his pants down do you recall either inserting your penis into his butt or finger?
A: I don't recall that[.]
Q: [Is it p]ossible that it may have happened?
A: Very possible, yes[.]
Q: Why do you say very possible?
A: I was drinking and something sick like that happened so, yeah I feel it very possible (inaudible)[.]
....
Q: Have you ever found yourself with any ah sexual tendencies towards [Larry]?
A: I found myself with none no.
Q: You ever thought of him in a sexual way?
A: Not with no clear head I didn't never did, no.
Q: What would you say to [Larry] when you were doing this? Do you remember some of things that you were saying to him?
A: No cause I don't remember doing it, so I mean (inaudible) I don't remember saying nothing to him.
Q: You don't remember saying anything to him?
A: No[.]
....
Q: Ok, do you think in your recollection that these things happened at night or during the day?
A: At night[.]
Q: And why would that be?
A: While I'm drinking.
Q: Ok did anybody ever see this?
A: Obviously not.
Q: Did you ever say anything to [Larry] about this or did he ever say anything to you about it?
A: No I never said anything to him about [it] because I don't recall the things, he never came over to me and said nothing about it.
Q: But then you keep saying you don't recall but you already [said] it's a possibility that you did it. Are you saying you can't recall as an excuse?

*368 A: No I'm not. I'm saying I can't recall cause I don't remember it but the possibility if I was drinking it could've happened.
....
Q: Ok can you see yourself doing that to him?
A: No[.]
Q: Look at me. Can you honestly see yourself doing that to him and not wanting to do that ever again?
A: I'd just say, I can not see myself doing that ever again to nobody[.]
Q: Ok but you could see yourself having done that to him and don't want to do it again.
A: I don't see myself having done it to him but I know I wouldn't want to do it again.
Following that statement, defendant was arrested and taken into custody.
Defendant contended at the suppression hearing that he did not knowingly and voluntarily waive his rights because he was not aware that he was a target of the investigation and the officers confronting him were not impartial and objective, but adversaries seeking to ensnare him. In denying the motion, the court relied on the fact that defendant came to the police station freely; was not threatened or coerced; never indicated that he wanted to consult an attorney or terminate the interview; and the questioning was not unduly lengthy. The court concluded that the Miranda waiver was made knowingly, freely, intelligently, and voluntarily; as a result, defendant's statement was deemed admissible.

B.

Victim's Statement
Also prior to trial, the State moved to permit the use of a videotape of Larry's interview, conducted by Investigator Asha Ritchards on May 30, 2004. The substance of the interview was replicated by Larry's later trial testimony (see infra p. 10) in which he recounted years of sexual abuse by defendant. In terms of the issue presented here, Larry's statement discussed defendant's alcohol use briefly:
Q: Okay what makes you think he would hurt you?
A: Because he drinks a lot of beer and he just sometimes hit me for no reason sometimes.
....
A: He has threatened ... he would threaten people ... when he's drunk he threaten people like um ... like he was gonna kill them or punch them.
Q: How does it make you feel when he does that?
A: Makes me feel bad cause he'll embarrass me ...
Q: Okay and where would he do that at?
A: Like when we're at parties he would drink a lot of beer and he would say that to his friends.
The court granted the State's motion to use Larry's statement, pursuant to New Jersey Rule of Evidence 803(c)(27). The propriety of that ruling is not before us, and, thus, the procedures surrounding the taking of Larry's statement will not be set forth.

C.

Trial
The case proceeded to trial. Laura Fox, Larry's mother, testified that a judge granted defendant temporary custody of Larry because she "had a problem with housing." Laura also testified that Larry revealed the sexual abuse to her on May 30, 2004, and, as a result, she took him to police headquarters. Investigator Ritchards *369 testified about the interview with Larry; the videotape of Larry's statement was then played for the jury.
Larry testified that he began living with defendant in 1997 when he was four years old and remained in defendant's care until 2003. According to Larry, during that six-year period, defendant sexually assaulted him on multiple occasions, most often by anal penetration. The assaults happened at night while Larry was asleep. On a few occasions, he woke up during the assault and he would see defendant "back there" with defendant's "thing in [his] behind." Other times, he would know that he was assaulted because the pain upon waking was so great that he would have trouble walking and going to the bathroom.
Larry also testified that defendant forced him to ingest Nyquil and pills so he would fall asleep faster and that defendant threatened that if he did not take the medication, defendant would beat him. According to Larry, on the few occasions he refused, defendant beat him with a belt or a shoe. In 2004, Larry told his mother and stepfather about the abuse after his mother discovered that Larry had "stuck [his] thing in his [brother's] behind." When asked why he did it, Larry testified that he "thought it was love ... because my uncle did it to me."
The State proffered the testimony of Investigator Hunsinger, who described his various interviews of defendant as well as defendant's confession. Through Investigator Hunsinger, the State admitted the audiotape of defendant's statement into evidence, distributed transcripts to the jury, and played the tape in open court. In addition, a pediatrician and an expert on Child Sexual Abuse Accommodation Syndrome testified.
Defendant took the stand in his own defense and denied sexually assaulting Larry. Defendant explained that, beginning in 1997, Larry would stay with him and his family on the weekends. When it came time to return Larry to Laura, defendant could not find her. Larry also expressed to defendant that he did not want to go home. In the spring of 1998, a judge granted defendant temporary custody of Larry. It was defendant's view that Laura encouraged Larry to lie because of her hard feelings over Larry's transfer into defendant's care.
Defendant explained that his prior statements were the product of police coercion; that the police directed his answers; and that they stopped the tape recorder during his taping of the interview. In particular, he claimed that the notion that he might have sexually abused Larry while intoxicated was invented by the police:
Q: And during the course of the taping, how did that go in terms of what the investigators were saying to you or doing with you?
A: They just had me so scared. I never been in this type of position before. And the way the man just keptthe way they was talking to me and have me thinking I was drinking, I was drunk, which didn't take place. And so they just had me so I just was like saying what they told me.
[(Emphasis added).]
The State addressed the issue of intoxication in its cross-examination of defendant:
Q: Wasn't your answer to the question, "Tell us about these allegations. I'm supposed to had, um, sex, um, sexual intercourse with [Larry].... [A]nd results of me probably drunk, of me drinking and things. That I'm very sorry for this happening and I think that it is a very sick thing to do."
A: Yes. All that's repeated what

*370 Q: That's what you said to Investigator Hunsinger?
A: Repeating what he told me.
....
Q: Okay. Let's flip to page 6, middle of the page. When posed with the question, "You indicated he hadyou had sexual intercourse with [Larry]?" Your answer was, "I might have had sexual intercourse with him, yeah. I really can't remember, so I might have been very intoxicated at the time." That was your answer?
....
A: That's the answer I said.
Q: I suppose Investigator Hunsinger told you to say that answer as well?
A: He kept telling me I was drunk.
....
Q: Let's go further down that page, on page 7. When questioned, "At any time do you recall when you were in the bathroom with him and he had his pants down, do you recall either inserting your penis into his butt or finger?" Your answer was, "I don't recall that."
A: Yes.
....
Q: And Investigator Hunsinger told you to say that answer as well?
A: This is all during the time he kept telling me I was drunk, yes.
....
Q: And then you continue on and say, "I'm saying I can't recall because I don't remember. Itbut the possibility if I was drinking, it could have happened." That was your answer?
A: Yes it was.
On re-direct examination, the defense again addressed the issue of defendant's alleged intoxication:
Q: All right. Now, who raised the possibility of your drinking to mean that it might have happened? When did that issue first come up?
A: It happened from [Investigator] Hunsinger.
Q: At what point in time?
A: At our pre-interview.
Q: The part of the interview that was not taped, correct?
A: Yes, before he start taping. He kept telling me that I was drunk.
On re-cross examination, the State focused a question on intoxication:
Q: You brought up the notion of you being drunk because you needed an excuse, correct?
A: No.
The defense rested after defendant's testimony. The State then re-called Investigator Hunsinger who testified that he did not stop the recording during defendant's statement nor did he direct defendant's answers. The State also called Sergeant Marcial to cast doubt on defendant's claims that he was coerced into confessing.

D.

Jury Instruction
The trial court conducted a charge conference prior to summations. During the conference, the court brought up the issue of voluntary intoxication sua sponte. The State immediately objected. Defense counsel agreed, noting that intoxication was never a defense in the case. The court, however, persisted in its view:
THE COURT: The reason I'm asking is we need to discuss this because the reason I'm bringing this upTake a look at the Miranda statement, take a look at his statement beforewhen he was interviewed by Investigators Hunsinger and Marci[a]l erases and it could negate one of the elementspotentially negate one of the elements of the charges. *371 That is, the knowing aspect of the charges.
I mean, I don't seeUnless there is some strategic way or some reason for not raising the defense. And the reason I bring it up is because it is there.
Defense counsel continued to object, asserting that defendant did not want the instruction. At that point, the State withdrew its objection:
[THE STATE]: Your Honor, initially I was objecting to it, but after speaking to a couple of colleagues in my office, I think in an abundance of cautionthe fact that there is evidence in the defendant's statement as to drinking, I think it should be charged.
THE COURT: [Defense counsel], you indicated that you consulted with your client and your client wishes that this charge not be given.
....
THE COURT: Do you have anyCan you give me a little more in terms of your position with regard to why this charge should not be given, given the fact that there is some testimonythere is some evidence in this case in which a reasonable jury could find intoxication as a defense.
[DEFENSE COUNSEL]: The problem arises from this, you Honor. My client testifiedIt was the pre-taping interview of him by the investigators at the Prosecutor's Office and he indicated that he was cajoled, threatened, told about being locked up for years.
"This is something maybe happened when you're drunk, you know, the child said it."
And my client was under a great deal of stress and duress at that particular point in time. He was trying to cooperate. He showed up at the Prosecutor's Office voluntarily. He thought he would get there and that would be the end of the matter once he gave his statement.
Quite the contrary was true.
And if you look at the transcript, he says he doesn't remember anything like that happening. He's searching for an explanation as to why [Larry] is saying something happened. He doesn't have any recollection of anything like that at all happening. Trying to be cooperative, trying to have it both ways.
So, the accommodation is that they are suggesting to him that he was intoxicated so "Yeah, it's [possible], I was intoxicated," but his position today is that he did not admit these acts and he was not intoxicated and that the instruction is not properly before the jury due to the circumstances under which those statements were elicited.
THE COURT: Is this a strategic move on your part? Is this a strategic consideration, [defense counsel], not charging
[DEFENSE COUNSEL]: (Interposing) It's not a strategic consideration on my part, your Honor.
....
[DEFENSE COUNSEL]: I think I can fairly say that I did tell my client, your Honor, that with an intoxication defense two things happen.
Number [o]ne, because of what the Court read a few minutes ago, he does stand a chance of knocking the grade of the crime down from first degree down to second ... degree.
But, then that also puts in the jury's mindsthey may try to look at it as "Well, he was drunk"well, they may try to split the baby, so to speak, in the way of acquitting him of the more serious charge but still finding him guilty of a less serious charge due to the intoxication.

*372 His position is that he was not intoxicated. They led him to make statements that were not true regarding intoxication[ ].
He wants the jury to decide on the merits whether or not these things happened or whether or not they were misled by the child's statements and the mother's statements.
....
[THE STATE]: Your Honor, I think this is the whole purpose of having the charge conference prior to summations. That way we can tailor our summations to what we know is going to be charged to the jury so that we can give the jury an advance notice that you are going to give the jurors the charge on A, B, and C and address it that way.
I think not to have it in there may havemay cause more questions in the jurors' minds.
[(Emphasis added).]
At the conclusion of the discussion, the trial court determined to issue the voluntary intoxication charge because the statements read into the record revealed that defendant drank beer over the time period during which the offenses allegedly occurred, and defendant's statement indicated the amount of beer he consumed.
Defendant again objected to the charge, stating:
[DEFENSE COUNSEL]: The reason I'm objecting to the charge, your Honor, is that intoxication is in the way of an affirmative defense and the defense that's not a defense we raised during the proceedings, during the pretrial or during the trial itself.
And by having a charge like that, you know, in essence, putting that defense out there that really flies in the face of the way we presented the case in terms of the testimony, the witnesses we chose to have testify, and how it developed my client's testimony during the course of his [d]irect examination and [c]ross-examination of the other witnesses as well who investigated him and interrogated him on that issue.
So, the reason I respectfully object, your Honor, is because I really think it works a prejudice against my client's case.
The State countered that Larry also mentioned defendant's drinking habits in his videotaped statement and because there were two separate references to defendant's alcohol use, the court should issue the charge. The court concluded that "[t]here is ample information contained in the record that would justify the Court doing it."
During summations the issue of intoxication was addressed by the defense:
Let's talk for a moment about the nature of what my client testified to happened before the audiotaping was done. When you listen to the tape of my client that was audiotaped, that segment that was audiotaped, you find out he makes some statements where he is hesitant, not comingtrying to figure out what is going on because they are asking him were there possibilities of things done.
He said "Possible? Yeah, it's possible[.]"
Why was it possible? If you listen to him testify as to what happened before they started taping ... Hunsinger told him "You were drunk, this is why you don't remember[.]"
And my client says "Well, if I was drunk and [Larry] is saying I did this, everything is coming down on me saying I did it, I must have done it[.]"
Trying to reconcile the two things.

*373 When they press himkeep going through the transcript and they are pressing him and what he remembers and doesn't remember.
He says "I don't remember doing it[.]"
He never admits he did it in the sense that he remembers doing these things because he didn't do these things.
The State countered:
In sexual assault cases you only have two people in the world who know what truly happened, [Larry] and the defendant. [Larry] told you what happened. He told Investigator Ri[t]chards. He told [his doctor]. He told us. The defendant also told you what happened.
Use your common sense here. Who is credible? Look at the defendant's statement, the audiotaped statement he gave Investigator Hunsinger and I want you to look at his testimony. Because, they differ.
In his audiotaped statement with Investigator Hunsinger he states when asked "If you anally penetrated your nephew" his answer was "It's possible; I may have had a few beers[.]"
Does that even sound close to being reasonable? I submit to you that it does not. It makes absolutely zero sense. It's not logical. It's not reasonable. It's not the truth.
"Is it possible? If I had a couple beers."
Look at the statement, listen to the statement, listen to it a couple of times back there. Look at the listening aide. Look at the videotape of [Larry's] statement.
....
He testified and stated it never happened. He said the statement he gave "Not my words; Investigator Hunsinger forced me, Sergeant Marcial forced me[.]"
Use your common sense here. He wasn't coerced. He actually thanked him at the end of that statement for letting him talk. He wasn't coerced.
Following summations, the trial court instructed the jury. Included was a voluntary intoxication charge:
Now, there exists evidence in this case of the defendant's use of intoxicants on one or more of the days alleged in the indictment.
Now, in order for intoxication to be established as a defense fully as to each of the counts of the indictment and to any lesser-included offenses, you must find that the defendant was intoxicated on each date as set forth in the indictment.
In other words, if you find that the defendant was not intoxicated at any time during the alleged crimes as set forth in the indictment, then the defendant may not avail himself or use the defense of intoxication.
Generally, ladies and gentlemen, a defendant is not relieved of criminal responsibilities because he is found to have acted under the influence of an intoxicating beverage. The general assumption is that every person is normal and is possessed of ordinary faculties.
The State need not prove that the defendant was sober. You may consider the evidence as to the defendant's consumption of alcoholic beverages in determining whether he was intoxicated to such a degree that he was incapable of acting knowingly.
Therefore, once there is some evidence of the defendant's intoxication, the State must prove beyond a reasonable doubt that such intoxication did not render the defendant incapable of acting knowingly.

*374 Intoxication under our law means a disturbance of mental or physical capacities resulting from the introduction of substances into the body.
In considering the question of intoxication you should carefully distinguish between the condition of the mind which is merely excited by intoxicating drink and yet capable of acting with knowledge and the condition in which one's... mental faculties are so prostrated as to deprive one of his will to act and ability to reason thereby rendering a person incapable of acting and thus preventing the person from committing the crime charged with the mental state required of knowingly.
Now, this distinction is important because as I explained whether or not the defense of intoxication applies is a factual determination, ladies and gentlemen, to be made by you.
You may also consider along with all the other evidence the degree of intoxication in determining whether or not the defendant was capable of acting with knowledge to commit the crime charged.
You will recall that I explained to you the elements of the crimes charged in the indictment and one of those elements as to each charge was that the defendant had to have acted with knowledge and I've already defined knowingly and knowledge to you and you are to apply that definition (sic.) when considering this intoxication.
If, after considering all the evidence, you have a reasonable doubt whether the defendant's intoxication was such as to render him incapable of acting knowingly, then you must acquit him of the crime charged in the indictment.
If, however, the State has proven to you beyond a reasonable doubt that the defense does not apply and that the State has proven all of the elements of the crimes previously defined for you beyond a reasonable doubt, then you must find the defendant guilty.
At the conclusion of the trial, the jury found defendant guilty of all charges. He was sentenced to an aggregate twenty-five-year custodial term with an eighty-five-percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.
Defendant appealed, raising a series of arguments, including a challenge to the trial judge's intoxication instruction. In a published opinion, the Appellate Division reversed and remanded the case for a new trial. R.T., supra, 411 N.J.Super. at 53, 983 A.2d 1177. In ruling, the panel concluded that defendant's vague statements regarding alcohol use, along with Larry's fleeting references thereto, would not permit a jury to conclude that "defendant suffered from such a `prostration of faculties' as to render him incapable of forming the requisite mental state to commit the crimes." Id. at 50, 983 A.2d 1177. In addition, the Appellate Division noted that a charge should be given over a defendant's objection "only where the facts in evidence `clearly indicate' the appropriateness of that charge." Id. at 48, 983 A.2d 1177 (quoting State v. Savage, 172 N.J. 374, 397, 799 A.2d 477 (2002)). According to the panel, the evidence did not satisfy that standard. Id. at 51, 983 A.2d 1177. Finally, the court held that the issuance of the charge impermissibly interfered with defendant's trial strategy, which was clearly articulated to the trial court during the charge hearing. Id. at 48-49, 983 A.2d 1177. The decision noted that defendant's trial strategy "rested on the theory that he did not commit the assault but, rather, he was cajoled by the police during his interview into stating he was intoxicated." Id. at 53, 983 A.2d 1177. According to the panel, by issuing the instruction, the trial *375 court may have suggested that it believed defendant actually committed the acts but was intoxicated at the time. Ibid.
The dissenting judge opined that, given defendant's "statements that his intoxication played a role in the sexual assaults," it was reasonable for the trial court to issue a voluntary intoxication instruction to guide the jury in its deliberations. Id. at 54, 983 A.2d 1177 (Espinosa, J., dissenting). The dissent also noted that the defense's "objection failed to articulate cognizable prejudice and rested upon an erroneous legal premise." Ibid. As a result, the dissent held that the charge was entirely appropriate and did not constitute reversible error. Id. at 68, 983 A.2d 1177. The State appealed to this Court as of right. R. 2:2-1(a)(2).

II.
The State argues that defendant's statement to the police was replete with references to his intoxication and that Larry's statement included like references and thus, the record "clearly indicated" a need for the intoxication defense.
Defendant counters that the proofs on intoxication, even if believed by the jury, could not support the conclusion that over the six-year period at issue, defendant's faculties were so "prostrated" that he was incapable of forming the intent to commit the crimes charged. As such, the charge should not have been given. In addition, defendant contends that the charge was unwarranted because it interfered with his trial strategy and denied him a fair trial.

III.
I turn first to a brief overview of the affirmative defense of voluntary intoxication. N.J.S.A. 2C:2-8 provides:
a. Except as provided in subsection d. of this section, intoxication of the actor is not a defense unless it negatives an element of the offense.
....
d. Intoxication which (1) is not self-induced or (2) is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his conduct did not know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Intoxication under this subsection must be proved by clear and convincing evidence.
e. Definitions. In this section unless a different meaning plainly is required:
(1) "Intoxication" means a disturbance of mental or physical capacities resulting from the introduction of substances into the body;
(2) "Self-induced intoxication" means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would afford a defense to a charge of crime.
Under that statute, self-induced intoxication can be a defense to a purposeful or knowing crime. State v. Cameron, 104 N.J. 42, 53, 514 A.2d 1302 (1986) ("[W]hen the requisite culpability for a crime is that the person act[ed] `purposely' or `knowingly,' evidence of voluntary intoxication is admissible to disprove that requisite mental state."). In Cameron, we recognized that the description of self-induced intoxication in N.J.S.A. 2C:2-8(e)(1) conforms with the historical case law definition: the "prostration of faculties such that defendant was rendered incapable of forming an intent." Id. at 54, 514 A.2d 1302.
In an effort to give guidance to judges and lawyers, Cameron also set forth a *376 series of factors which can be considered in determining whether the voluntary intoxication charge should issue. Id. at 56, 514 A.2d 1302. They include, but are not limited to: (1) the quantity of alcohol consumed; (2) the period of time during which the alcohol was consumed; (3) the actor's conduct; (4) noticeable odor of alcohol; (5) the results of blood alcohol content tests; and (6) the defendant's ability to recall relevant facts. Ibid. The ultimate question for the judge is whether the evidence would permit a jury to conclude "that defendant's `faculties' were so `prostrated' that he or she was incapable of forming an intent to commit the crime." State v. Mauricio, 117 N.J. 402, 418-19, 568 A.2d 879 (1990). If not, there is no warrant for the charge. Cameron, supra, 104 N.J. at 53-54, 514 A.2d 1302. A jury issue arises only if the evidence is such that a jury could conclude that defendant's faculties were so prostrated. Mauricio, supra, 117 N.J. at 418, 568 A.2d 879; Cameron, supra, 104 N.J. at 54, 514 A.2d 1302.

IV.
Whether to charge a particular affirmative defense can arise in distinct ways and discrete approaches have developed to address those different scenarios. In contour, those approaches parallel the ones we have adopted in the cognate, but not identical, setting of lesser-included offenses.[3] As we said in State v. Walker, 203 N.J. 73, 999 A.2d 450 (2010):
For guidance, we look to the standard that we require concerning a trial court's duty to charge the jury sua sponte with lesser-included offenses. See State v. Denofa, 187 N.J. 24, 42 [898 A.2d 523] (2006) ("In setting standards for when the trial court must charge the jury on territorial jurisdiction, we find an apt paradigm in our lesser included-offense jurisdiction."); State v. Robinson, 136 N.J. 476, 489 [643 A.2d 591] (1994) (in addressing when court should submit lesser-included offense of attempted passion/provocation manslaughter to jury in absence of request, we stated "that it is only when the facts clearly indicate the appropriateness of that charge that the duty of the trial court arises." (citation and internal quotation marks omitted)). We emphasized in Denofa, supra, that in the absence of a request to charge, "[o]nly if the record clearly indicates a lesser-included charge... must the court give the required instruction." 187 N.J. at 42 [898 A.2d 523]. To be sure, when counsel requests such a charge, the court should give the charge if there is a rational basis in the record for doing so. Ibid. In any event, "when the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." Ibid.

We hold that those standards apply when considering whether to charge a jury with the defense to felony murder. That is, if a defendant requests a charge on the defense and there is a rational basis in the record to give it, then the court should give the requested instruction. On the other hand, if counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it.

*377 [Id. at 86-87, 999 A.2d 450 (footnote omitted).]
In other words, where counsel requests a charge on a defense, it will be given if there is a rational basis in the evidence to do so. Where counsel does not request an instruction, the "clearly indicated" standard will apply. That standard does not require the court "to sift through the entire record ... to see if some combination of facts and inferences might rationally sustain" a charge, State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985), instead, the need for the charge must "jump off" the proverbial page. Denofa, supra, 187 N.J. at 42, 898 A.2d 523.
Even if there is evidence in the record to support a charge, additional factors require analysis. Those factors include whether counsel is surprised, how the case was tried, whether the defense is incompatible with defendant's position at trial, or whether the instruction would prejudice the defense in some way. See Choice, supra, 98 N.J. at 300-01, 486 A.2d 833. Indeed, in State v. Garron, 177 N.J. 147, 827 A.2d 243 (2003), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004), where we affirmed that the clearly indicated standard requires an instruction on a lesser-included offense, we took particular note of the fact that:
in a case in which instructing a jury on a lesser-included offense would be so unanticipated by either party as to cause complete surprise, or so inconsistent with the defense as to undermine the fairness of the proceedings, the trial court may depart from this general rule, but must place its reasons for doing so on the record.
[Id. at 180-81, 827 A.2d 243.]
Obviously, strategy takes on added significance where a charge regarding an affirmative defense is at issue. Unlike the lesser-included scenario which has public policy implications, id. at 180, 827 A.2d 243, a defendant generally has a right to defend a case as he sees fit. Thus, "[t]rial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal. The public interest, while important, may not overwhelm defendant's interest in pursuing a legitimate defense in the complex setting of a criminal trial." State v. Perry, 124 N.J. 128, 162-63, 590 A.2d 624 (1991). As a result,
[i]n a close case, forcing counsel to incorporate defenses that pre-suppose the existence of the very fact his main method of defense contests destroys the credibility and coherence of the defense entirely. Our analysis of the duties of a trial judge must be "seasoned by a degree of deference to defense counsel's strategic decisions."
[Id. at 163, 590 A.2d 624 (quoting State v. Marshall, 123 N.J. 1, 92, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993)).]
It follows that, in the face of an objection to a charge regarding an affirmative defense, a court must decide how the proposed charge relates to the way in which a defendant has defended himself. By way of example, we have held that a defendant who chooses to defend a case on the ground that the State cannot prove that he actually participated in a killing, should not have a self-defense instruction foisted on him, even if there is evidence in the record to that effect. Id. at 153, 590 A.2d 624; see also State v. Vasquez, 265 N.J.Super. 528, 550, 628 A.2d 346 (App. Div.), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993).
The reason is obvious. All affirmative defenses from self-defense, State v. Kelly, 97 N.J. 178, 198, 478 A.2d 364 (1984), to *378 insanity, State v. Winder, 200 N.J. 231, 241-42, 979 A.2d 312 (2009), have, at their core, the notion that a defendant has indeed committed the interdicted act but that he should be excused from its consequences. See State v. Harmon, 104 N.J. 189, 209, 516 A.2d 1047 (1986) (holding affirmative defense is narrower concept than other defenses and "excuses conduct that is otherwise unlawful").[4] It goes without saying that a defendant who denies having committed a crime should not be required to acknowledge, either explicitly or inferentially, complicity in the event by way of a compelled affirmative defense.
As is evident, those are fact-sensitive issues which will require a case-by-case analysis. In general, however, an affirmative defense should not be imposed on an unwilling defendant. See, e.g., Perry, supra, 124 N.J. at 162-63, 590 A.2d 624; Choice, supra, 98 N.J. at 300-01, 486 A.2d 833; see also People v. Salas, 37 Cal.4th 967, 38 Cal.Rptr.3d 624, 127 P.3d 40, 49 (2006) (affirmative defense instruction not warranted where inconsistent with defendant's theory of case); People v. Bradley, 88 N.Y.2d 901, 646 N.Y.S.2d 657, 669 N.E.2d 815, 816 (1996) ("[A] defendant ... has the right to chart his own defense. That right is infringed when an affirmative defense is submitted over defense objection and defendant is thereby prejudiced." (quoting People v. DeGina, 72 N.Y.2d 768, 537 N.Y.S.2d 8, 533 N.E.2d 1037, 1041 (1988)) (internal quotation marks omitted)).

V.
Applying those standards, I am satisfied, as was the Appellate Division, that the instruction on voluntary intoxication should not have been given. R.T., supra, 411 N.J.Super. at 38, 983 A.2d 1177. Although there was evidence regarding intoxication in the record, it was not a narrative thread in the case. To the contrary, defendant denied intoxication outright and claimed that the idea came from the police. His sole defense was that he never sexually abused Larry. In response, the State only used the intoxication issue to undermine defendant's credibility before the jury and made clear its disbelief that intoxication played any role in the case, characterizing the notion as nothing more than an "excuse," "not reasonable," and "not the truth."
Further, on this record, the instruction was unwarranted because of the vagueness of the allusions to drinking. In fact, while Larry expressed his fear of defendant because of his drinking, Larry's references did not address the time of the assaults at all, but only family parties at which defendant drank too much. Defendant's own statement was to the effect that he sometimes drank four to eight beers beginning midday through evening; that he "might" have been "very intoxicated"; was "probably" drunk and drank "often"; and "at times" would get somewhere between "buzz[ed]" to "halfway drunk." He did not claim alcoholic blackouts in the statement and remembered many details of his late night interactions with Larry. That evidence was simply not sufficient to permit a finding of "great prostration of faculties" and, thus, should not have been submitted to the jury. As the Appellate Division reasoned below:

*379 Defendant was charged with conduct occurring on diverse dates from July 15, 1997 through June 30, 2003. Here, there were just vague references to drinking contained in defendant's statement to the police and [Larry's] statement to the investigator, i.e., "conclusory labels, of little assistance in determining whether any drinking produced a prostration of faculties." State v. Mauricio, supra, 117 N.J. at 419 [568 A.2d 879] (quoting State v. Cameron, supra, 104 N.J. at 56 [514 A.2d 1302]). Considering the Cameron factors, during the requisite time frame there was no evidence of defendant's blood-alcohol level, the amount of alcohol he had consumed or over what period of time he had been drinking, or that he smelled of alcohol or had any other physical manifestations of intoxication. It is not even suggested that defendant had imbibed large quantities of alcohol.
[R.T., supra, 411 N.J.Super. at 50, 983 A.2d 1177.]
The long span of time during which the acts of sexual abuse were alleged to have occurred presents an additional hurdle. Here, in order to sustain the defense, the evidence would have had to show defendant's "faculties" were so "prostrated" on each occasion of sexual assault over the six-year period that he could not form the requisite intent. No reasonable jury could so conclude. Thus, the trial judge, as gatekeeper, should have declared that the intoxication charge was not "clearly indicated" on this record.
Such a ruling would have been consistent with other New Jersey case law declining to authorize a voluntary intoxication charge on similar evidencei.e., where the proofs suggested intoxication but not to the extent that a jury could find defendant incapable of purposeful or knowing action. See, e.g., State v. Johnson, 309 N.J.Super. 237, 267-68, 706 A.2d 1160 (App.Div.) (finding no factual or legal basis for voluntary intoxication charge when absence of "meaningful expert testimony or reliable observations of intoxication" compared to defendant's recollection of events), certif. denied, 156 N.J. 387, 718 A.2d 1216 (1998).
In any event, the inquiry should not have ended with the question of whether the record "clearly indicated" the existence of intoxication, but should also have focused on whether the compelled charge confounded the defense strategy. Defendant claimed at trial that he never sexually abused Larry, that the allegation resulted from bad blood between him and Larry's mother, and that the idea of intoxication was foisted on him by the police. In other words, not only did defendant choose not to raise the affirmative defense of intoxication, he specifically rejected it.
In instructing the jury otherwise, the judge inferentially, if not directly, injected into the case an issue that simply did not belong therethat defendant, in fact, agreed that he sexually abused Larry but was seeking to be excused from the consequences of his acts. Indeed, during the charge, the judge specifically stated "if you find that the defendant was not intoxicated at any time during the alleged crimes as set forth in the indictment, then the defendant may not avail himself or use the defense of intoxication." (Emphasis added). By that language, the judge directly suggested to the jury that the defendant was in fact relying on the intoxication defense, which was not the case. In that respect this is an analogue to Perry and Vasquez, which declared a defendant who defends his case on the grounds of non-participation should not suffer a self-defense instruction, even if there is evidence to that effect. Perry, supra, 124 N.J. at *380 163, 590 A.2d 624; Vasquez, supra, 265 N.J.Super. at 550, 628 A.2d 346. Given the facts in this matter, the instruction was an unwarranted incursion on defendant's right to defend the case as he saw fit.

VI.
The final question is whether that error was harmful. Although the issue is close, I have concluded that it was. This was a one-on-one-witness case which depended solely on the jury's evaluation of the credibility of Larry and defendant; there was no physical evidence or independent witness to the events at issue. Further, defendant advanced colorable reasons why Larry might be lying. In such a case, any error that could tip the credibility scale is necessarily harmful. State v. Frisby, 174 N.J. 583, 596, 811 A.2d 414 (2002); see also State v. Smith, 167 N.J. 158, 189, 770 A.2d 255 (2001). As the Appellate Division pointed out, issuance of the instruction may have led the jury to think the judge believed that defendant committed the acts with which he was charged. R.T., supra, 411 N.J.Super. at 53, 983 A.2d 1177. At the same time, because of what the judge said about defendant seeking to "use" or "avail" himself of the defense, the issuance of the charge suggested to the jury, at least inferentially, that defendant agreed that the wrongful acts took place. Because the issue of whether there was confusion over the voluntary intoxication charge is, at least, debatable, I cannot say that the instruction was harmless. R. 2:10-2. Thus, I would affirm the Appellate Division's conclusion that defendant is entitled to a new trial.
Chief Justice RABNER, concurring in part and dissenting in part.
I agree with the concurring opinion's conclusion that the evidence in this case did not warrant a voluntary intoxication charge. See ante at 493, 513-15, 16 A.3d at 365, 379-80. I therefore concur with the analysis of that issue.
I disagree with the conclusion that that error was harmful. See id. at 514-15, 16 A.3d at 380. The harmless error standard "requires that there be `some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005) (alterations in original) (quoting State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973) (citation omitted)). That determination must be made in the context of the entire record. See State v. Marshall, 123 N.J. 1, 200, 586 A.2d 85 (1991).
Judge Espinosa's dissent in the Appellate Division ably illustrated why the charge did not prejudice defendant. See State v. R.T., 411 N.J.Super. 35, 63-68, 983 A.2d 1177 (App.Div.2009) (Espinosa, J., dissenting). In summary, she explained that
[d]efendant was convicted of the offenses in the indictment. Therefore, he did not suffer the only prejudice ever identified by his counselconviction of a lesser offense. The evidence of defendant's guilt included his own statement to the police and the testimony of the victim regarding the assaults. If accepted by the jury, this evidence was more than adequate to support the verdict. Neither the defense nor the majority has explained how the omission of an instruction on intoxication would have produced a different result.
[Id. at 68, 983 A.2d 1177.]
The jury charge on voluntary intoxication did not make defendant's convictions for first-degree aggravated sexual assault and second-degree endangering the *381 welfare of a minor more likely. I do not believe that the instruction tilted the balance against defendant in a way that reasonably contributed to the verdict. Any oblique inference gleaned from the intoxication instruction would have had, at most, a negligible effect on the jury, in the face of defendant's pretrial statements, his strong denials at trial, and the State's contrary proofs, all of which the jury had to assess directly.
In my judgment, in the context of the entire record, the addition of the charge did not lead "the jury to a verdict it otherwise might not have reached." State v. R.B., supra, 183 N.J. at 330, 873 A.2d 511 (internal citation omitted). Nor did it lead to an unjust result. Ibid. As a result, I believe that the error was harmless and therefore respectfully do not agree with the concurring opinion on that point.
Justices RIVERA-SOTO and HOENS, dissenting.
We respectfully dissent substantially for the reasons so ably set forth by Judge Espinosa in her dissent below, State v. R.T., 411 N.J.Super. 35, 54-68, 983 A.2d 1177 (App.Div.2009).
As Judge Espinosa succinctly noted, "[t]he only challenge to the jury charge is the claim that the trial court erred in giving an instruction on voluntary intoxication." Id. at 67, 983 A.2d 1177. She then explained the governing principle of law: "When the error alleged concerns only a portion of a charge, the challenged portion is not to be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." Ibid. (citations and internal quotation marks omitted). She noted that "[r]eversal of a conviction will be warranted only if the instruction, taken as a whole, proves to be misleading or prejudicially ambiguous[,]" and that "[e]ven when there is an objection, error must be clearly capable of producing an unjust result to justify reversal." Ibid. (citations and internal quotation marks omitted). She emphasized that "[t]he fact that the trial court did not incorporate the defense theory in the jury charge by omitting a charge on intoxication does not raise a reasonable doubt that the jury would have reached a different result." Id. at 67-68, 983 A.2d 1177 (citations omitted). In words equally applicable in this Court, Judge Espinosa concluded:
In reversing defendant's conviction based upon one isolated alleged error, the majority did not examine the charge in its entirety as required. As reflected by defendant's failure to object to any other portion of the charge, the charge accurately identified the elements of each offense, correctly informed the jury of the State's burden of proof and properly charged the jury on the only appropriate lesser-included offense.
Defendant was convicted of the offenses in the indictment. Therefore, he did not suffer the only prejudice ever identified by his counselconviction of a lesser offense.... Neither the defense nor the majority has explained how the omission of an instruction on intoxication would have produced a different result.
In summary, the trial court's decision to provide the jury with an instruction on involuntary intoxication was an appropriate exercise of discretion based upon the court's evaluation of the evidence. The court was not obliged to abandon this judgment in the face of an objection that failed to articulate cognizable prejudice to defense strategy. The record fails to show that defendant was prejudiced by the charge. The verdict had adequate support in the evidence and the isolated error alleged within the context of an otherwise unchallenged charge lacked the capacity to lead to an unjust result.

*382 [Id. at 68, 983 A.2d 1177.]
We cannot improve on Judge Espinosa's cogent and reasoned analysis. Therefore, for the reasons she expressed, we respectfully dissent.
For Concurrence in Part/Dissent in PartChief Justice RABNER1.
For affirmanceJustices LONG, LaVECCHIA and ALBIN3.
DissentJustices RIVERA-SOTO and HOENS2.
Not ParticipatingJudge STERN (t/a).
NOTES
[1] All parties' names are pseudonyms.
[2] Although defendant challenged the administration and use of the CVSA below, it is not an issue before us.
[3] The rationale for the lesser-included charge is the recognition that: "where the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest." State v. Powell, 84 N.J. 305, 319, 419 A.2d 406 (1980).
[4] Alibi is sometimes incorrectly denominated as an affirmative defense. See State v. Peetros, 45 N.J. 540, 551, 214 A.2d 2 (1965) (Francis, J., dissenting) ("An alibi is not an affirmative defense. It is simply a denial that the accused committed the crime...."); State v. Mucci, 25 N.J. 423, 431, 136 A.2d 761 (1957) ("The plea of `alibi' is not an affirmative defense in the strict, technical sense, but it is defensive in nature.").