**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0105-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRANDON E. PETERSEN,
a/k/a BRANDON EDWARD
PETERSEN,

     Defendant-Appellant.

_____

Submitted January 7, 2026 – Decided April 17, 2026

Before Judges Mayer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 23-03-0061.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Renee M. Robeson, Hunterdon County Prosecutor, attorney for respondent (Tangerla Thomas, Senior Assistant Prosecutor, and Christina Ludwig, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Brandon Petersen appeals his conviction for first-degree murder and related charges following a jury trial. We affirm.

I.

On December 6, 2020, defendant and a companion, Michele Carkhuff, arrived unannounced at Sarah Conrad's apartment in Delaware Township. The apartment was located within a farm estate. Conrad, friends with Carkhuff but unfamiliar with defendant, hesitated to admit them. Because Carkhuff complained of a toothache, Conrad allowed them inside so Carkhuff could rest. Carkhuff took medication and fell asleep on Conrad's couch.

While Carkhuff was sleeping, Conrad and defendant smoked marijuana. Defendant also produced a water pipe or bong. Conrad would later tell police she and defendant had smoked marijuana and ingested psychoactive mushrooms. However, at trial, she testified she smoked marijuana but did not consume any mushrooms and did not see defendant do so.

After Carkhuff awoke, defendant and Conrad drank a few ounces of rum. The trio then began cleaning the apartment and cooking dinner in the kitchen. Defendant offered to chop vegetables and asked for a knife. While chopping, he suddenly stabbed Carkhuff in the neck with the knife, striking her jugular

2

A-0105-23

vein. A second stab penetrated Carkhuff's left eyebrow, fracturing her forehead bone. She also suffered knife wounds to her left hand, described at trial as defensive wounds. Despite her injuries, Carkhuff retreated to a bathroom, locking herself inside. Conrad managed to unlock the bathroom door and found Carkhuff on the floor, covered in blood.

Defendant attempted to flee in his vehicle, but it would not start. While defendant worked to start his vehicle, Conrad called her friend, Kate Gilmour, for help. Conrad then went outside to move her own pickup truck closer to the residence. As Conrad was moving the truck, defendant overpowered and pulled her out, then drove away in Conrad's truck. Conrad returned to the apartment to assist Carkhuff.

As Gilmour and her boyfriend, Peter Samuels, reached the estate, they encountered defendant exiting from the driveway. Defendant told Gilmour and Samuels that Carkhuff was back at the apartment and needed help, then drove away. Reaching the apartment, Gilmour and Samuels found Conrad with Carkhuff, whose breathing had become labored. With Gilmour and Conrad tending to Carkhuff in the back seat, Samuels drove to the hospital, where Carkhuff was pronounced dead.

A-0105-23

In their investigation of Conrad's apartment, police observed signs of a struggle—food on the floor, a knife on the kitchen floor with blood on the blade, and blood droplets trailing to the bathroom. Police also located Conrad's pickup truck several miles away, abandoned with its keys inside. Following a tip from defendant's ex-fiancée, Pennsylvania State Police arrested defendant in the early morning of December 7 in Upper Black Eddy, Pennsylvania.

Hunterdon County Prosecutor's Office Detective Sergeants Aaron Lacey and Peter Pfeifer interviewed defendant at the Pennsylvania State Police barracks. After waiving his Miranda[1] rights at approximately 10:20 a.m., defendant recounted his version of the events to police. He stated all three of the individuals originally in the apartment had consumed alcohol, smoked marijuana, and that Conrad and Carkhuff had snorted cocaine. He denied consuming mushrooms, the subject having been conveyed to police in their interview of Conrad. According to defendant, Conrad became angry and argued with Carkhuff. Although he did not see Conrad stab Carkhuff, he purportedly heard somebody say "Oh my f[***]ing God, why did you f[***]ing do that[?]" Then he "heard [Conrad] start f[***]ing screaming like she was talking to somebody, but there was nobody else in [the room]. I was in [another] room

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0105-23

and -- I don't know. Either she's yelling at herself for doing it or yelling at [Carkhuff] for making her do it. I don't know."

The detectives asked if defendant had ever been diagnosed with any mental illness. At first, defendant described having been diagnosed as having attention deficit disorder and attention deficit hyperactivity disorder. Lacey responded, "Well, that's a learning disability." When Lacey pointedly asked, defendant denied ever having been diagnosed with bipolar disorder or schizophrenia.

After being advised he faced extensive prison time if convicted, defendant then said, "I have antisocial disorder. I have bipolar disorder and borderline schizophrenia[,]" adding that although he had taken medications for those conditions in the past, he had not "taken any in a long time." At trial, Lacey testified defendant did not appear intoxicated or under the influence of drugs during the interrogation.

In July 2021, a grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three); fourth-degree unlawful taking of means of conveyance,

A-0105-23

N.J.S.A. 2C:20-10(b) (count four); and third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1)-(5) (count five).

Trial took place over thirteen days in May 2023. Defendant pursued a third-party guilt defense, contending Conrad was the perpetrator. Conrad testified, denying culpability. The jury found defendant guilty of murder, weapons, and unlawful taking charges, acquitting him of witness tampering. The trial judge merged count two with count one for sentencing and imposed an aggregate term of sixty-years' imprisonment subject to an 85% period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge imposed two concurrent eighteen-month terms for counts three and four to run concurrent to the sentence for count one.

Defendant timely appealed, raising three arguments:

> POINT I
>
> THE COURT ERRED IN NEGLECTING TO CHARGE THE DEFENSE OF DIMINISHED CAPACITY, WHICH WAS CLEARLY INDICATED IN THE RECORD. U.S. Const. amends. V, VI, XIV; N.J. Const. art. I, ¶¶ 1, 9, 10. (Not raised below).
>
> POINT II
>
> THE COURT ERRED IN NEGLECTING TO CHARGE THE DEFENSE OF INTOXICATION, WHICH WAS CLEARLY INDICATED IN THE

A-0105-23

RECORD.  <u>U.S. Const.</u> amends. V, VI, XIV; <u>N.J. Const.</u> art. I, ¶¶ 1, 9, 10.  (Not raised below).

POINT III

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE IMPROPER BOLSTERING OF THE STATE'S MAIN ACCUSER.  <u>U.S. Const.</u> amends. V, VI, XIV; <u>N.J. Const.</u> art. I, ¶¶ 1, 9, 10.  (Not raised below).

II.

<u>Jury Instructions</u>

We first address the arguments pertaining to jury instructions, noting defendant did not object to jury instructions and did not request an instruction on third-party guilt.  Generally, we review the instruction for plain error.  <u>State v. Montalvo</u>, 229 N.J. 300, 320-21 (2017) (citing <u>R.</u> 1:7-2; <u>State v. Wakefield</u>, 190 N.J. 397, 472-73 (2007)).  "Plain error refers to any error 'clearly capable of producing an unjust result.'"  <u>Ibid.</u> (quoting <u>R.</u> 2:10-2).  "[P]lain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'"  <u>State v. Chapland</u>, 187 N.J. 275, 289 (2006) (quoting <u>State v. Hock</u>, 54 N.J. 526, 538 (1969)).

7

That standard does not require the court "to sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain" a charge. State v. Choice, 98 N.J. 295, 299 (1985). "[I]nstead, the need for the charge must 'jump off' the proverbial page." State v. R.T., 205 N.J. 493, 510 (2011) (quoting State v. Denofa, 187 N.J. 24, 42 (2006)).

> [A] trial court's sua sponte obligation to instruct the jury in respect of any defense–whether affirmative or tailored to negate an element of the offense–is triggered only when the evidence clearly indicates or clearly warrants such a charge, and that the trial court is not called on to scour the record in detail to find such support.
>
> [State v. Rivera, 205 N.J. 472, 490 (2011).]

Where a defendant does not object to a jury instruction, however, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012) (citing State v. Macon, 57 N.J. 325, 333-34 (1971)).

Defendant claims the record established diminished capacity based on mental disease or defect, N.J.S.A. 2C:4-2, and substantial drug and alcohol consumption, N.J.S.A. 2C:2-8, warranting sua sponte instruction for both affirmative defenses. We disagree.

N.J.S.A. 2C:4-2 provides:

[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

Our Supreme Court has held,

a jury instruction is warranted when [a] defendant has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea. We now hold that all mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense if the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime.

[State v. Galloway, 133 N.J. 631, 647 (1993) (emphasis added).]

Here, the record contains no psychiatric evaluation or expert testimony supporting diminished capacity; nor does it contain evidence that the claimed deficiency affected defendant's cognitive capacity to form the required mental state. In short, nothing in the record suggests a diminished capacity defense, prompting the need for a charge to "jump off the proverbial page" and be

9

included in the final jury instruction. Rivera, 205 N.J. at 490; Galloway, 133 N.J. at 647.

Voluntary intoxication is available where evidence shows extreme "prostration of faculties" at the time of the offense. State v. Cameron, 104 N.J. 42, 56 (1986); see also N.J.S.A. 2C:2-8; State v. Mauricio, 117 N.J. 402, 418 (1990).

On record review, we determine evidence of intoxication was de minimis. Conrad and defendant admitted consuming small amounts of rum and smoking marijuana, but Conrad denied consumption of these substances was excessive. When interviewed by the police, defendant initially denied ingesting psychoactive mushrooms, and police did not find any evidence of "psychoactive substances" at the crime scene. No corroboration exists for cocaine use.

Defendant assisted with meal preparation, even requesting gloves to do so. His actions demonstrated awareness and were goal-directed, including his taking methodical steps to flee the scene. Lacey testified he found defendant alert and responsive during the interview. Cameron requires great "prostration of faculties," entirely absent here. 104 N.J. at 56. Defendant's conduct and recollection of contemporaneous observations belie a viable intoxication defense.

A-0105-23

Lastly, Rule 3:12-1 requires that "[n]o later than seven days before the [i]nitial [c]ase [d]isposition [c]onference[,] . . . [a] defendant shall serve on the prosecutor a notice of intention to claim any of the defenses listed herein . . . ." The Rule further provides for a defendant to "furnish the prosecutor with discovery pertaining to such defenses at the time the notice is served," with extensions granted on good cause shown. Here, defendant gave no notice of intent to rely on either affirmative defense. Neither did he present expert testimony nor other evidence linking his alleged mental impairments at the time of the offense. Instead, he relied on a third-party guilt defense, a theory fundamentally at odds with defenses based on diminished capacity or intoxication.

Witness Bolstering

Defendant contends the State improperly bolstered its witness, Lacey, denying him due process by commenting favorably on Conrad and her credibility.

Witness testimony may not be bolstered by law enforcement opinion. N.J.R.E. 607(b); State v. Frisby, 174 N.J. 583, 594-96 (2002); State v. Clausell, 121 N.J. 298, 337-38 (1990). If, as here, "a defendant fails to object to improper testimony at trial, the plain error rule applies." State v. R.K., 220

11                                                                A-0105-23

N.J. 444, 458 (2015) (citing R. 2:10-2; State v. Bogen, 13 N.J. 137, 141-42 (1953)). Even if the State improperly bolsters a witness's testimony, a defendant's conviction will not be overturned if there is "overwhelming admissible evidence" of guilt. State v. Prall, 231 N.J. 567, 588-89 (2018) (holding although the trial court erred by admitting hearsay evidence, the reviewing court should not have reversed the defendant's conviction because the error was harmless in light of the overwhelming evidence against him).

With these principles in mind, we consider pertinent portions of Lacey's testimony:

> [Prosecutor]: All right. And who did you interview?
>
> [Lacey]: The three individuals I interviewed w[ere] Sarah Conrad, Pete Samuels, and Kate -- her name escapes --
>
> [Prosecutor]: Would it have been Kate Gilmour?
>
> [Lacey]: Kate -- Kate Gilmour, correct.
>
> [Prosecutor]: And with regard to Sarah Conrad, did you, in fact, sit down and have a conversation with her?
>
> [Lacey]: Yes. [Conrad] was the first individual I spoke to.
>
> [Prosecutor]: And what was your purpose for talking to Sarah Conrad?

[Lacey]: My purpose for talking to [Conrad] and the other [two] individuals [was to] kind of get an understanding of what had occurred at the residence in Delaware Township.

[Prosecutor]: And prior to talking to [] Conrad, was she given her <u>Miranda</u> warnings?

[Lacey]: Yeah. I, you know, Mercer County Prosecutor's Office provided us an interview room, [] where we could record both audio and video of my interview of [Conrad]. After introductions, I advised [Conrad] of her constitutional rights, her <u>Miranda</u> warning.

[Prosecutor]: And why did you give her <u>Miranda</u> warnings prior to speaking with her?

[Lacey]: Well, [Conrad] was in investigational custody, and I had . . . questions for her.

[Prosecutor]: And when you say investigational custody, was she free to leave at that point?

[Lacey]: No, she was not.

[Prosecutor]: And was she being questioned as a witness or a suspect at that point?

[Lacey]: At that time, I didn't know what [Conrad] was. At that time, she, you know, depending on my interview of her, she was treated both as a witness and a suspect.

[Prosecutor]: And did she speak freely to you about what had occurred at 127 Kingwood Stockton Road?

[Lacey]: She agreed to speak to me. She waived her constitutional rights, both verbally, and in writing, on

the <u>Miranda</u> card.  And she voluntarily . . . agreed to speak to me.

[Prosecutor]:  And what did she say happened there?

[Lacey]:  She -- essentially, she gave me the timeline as best that she could remember it of the events of that evening.  And ultimately, she told me that [defendant] had stabbed Michele Carkhuff.

[Prosecutor]:  Did you make note of [] Conrad's demeanor while you spoke to her?

[Lacey]:  I did.  Sarah Conrad, when I initially was speaking to her, she was extremely upset, she was emotional, and she was -- it was kind of difficult to understand, and kind of keep her on track in regards to what had happened, particularly for my purposes, a timeline of what happened.

[Prosecutor]:  Did she appear to be . . . intoxicated?

[Lacey]:  No, she did not.

[Prosecutor]:  Did you smell alcohol on her breath when you spoke to her?

[Lacey]:  No, I didn't.

[Prosecutor]:  How long would you say the interview lasted with [] Conrad?

[Lacey]:  It's difficult to say exactly how long it lasted.  I know that I began speaking to her probably around 12:38 a.m.  At some point in time, we had stopped, and what I had done, is I went and I questioned the other two individuals.  And while she sat in the interview room, the recording just kept going.  And then,

14

A-0105-23

eventually, after I had completed those other two interviews, I had gone back in to kind of clean up and [ask] some follow-up questions I had for [Conrad] in regards to some of the things that I had learned. I just kind of wanted to corroborate the story a little bit with [Conrad] from talking to [Samuels] and [Gilmour]. And I believe when I went back in and spoke to her, it was sometime after 4 a.m.

[Prosecutor]: And after you concluded your interview with [] Conrad, did you still consider her to be a possible suspect or a witness at that point?

[Lacey]: After speaking to [Conrad], and then, speaking to Pete Samuels, and to [Gilmour], at that time, I looked at [Conrad] as a witness, not a suspect.

[Prosecutor]: And can you explain why?

[Lacey]: Yeah. It -- during the course of my interview, I had learned that at the house that [Conrad] gave me great detail as to . . . what she had saw, and what had happened. And just the mere fact that she had rendered aid, called for help, tried to assist her friend, she became more of a witness than a suspect at that time.

From this exchange, we discern Lacey made no credibility determination regarding Conrad. The import of Lacey's testimony concerned investigative measures and how he reached a conclusion about Conrad as a potential witness—rather than a suspect—during the investigation, not her testimony at trial. Thus, unlike the police officers in Frisby and Clausell, Lacey did not comment on the credibility of Conrad's trial testimony or her capabilities as a

15

trial witness.  See Frisby, 174 N.J. at 594-96; Clausell, 121 N.J. at 337-38.  Thus, the record reflects no attempt, explicit or implied, to bolster Conrad's testimony. Even if we concluded some measure of bolstering occurred, which we do not, there was overwhelming evidence supporting defendant's guilt and negating any error.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

16