**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5245-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DAVID C. THOMAS,

     Defendant-Appellant.

_____

Submitted January 31, 2019 – Decided August 22, 2019

Before Judges O'Connor and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 15-08-0590.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sarah C. Hunt, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant David C. Thomas appeals from a July 13, 2017 judgment of conviction for aggravated sexual assault and simple assault. We affirm.

I.

The following facts are derived from the record. There is no dispute that on July 23, 2015, defendant, then thirty-eight, had sexual intercourse with R.B.,[1] an eighty-three-year-old woman who lived alone in an apartment in Gloucester County. At the time, defendant was living in the same apartment complex and frequently visited his uncle Clifton, who was R.B.'s neighbor. Although defendant claims the encounter, which left R.B. with a number of significant physical injuries, was consensual, a jury found the State's evidence that defendant raped R.B. credible.

Defendant had military training as a member of the army national guard, where he served as a combat medic, was trained in firefighting and water survival, and worked in seismic drilling, lifting hundred-pound aluminum poles into holes in the ground. R.B. was, according to A.F., her upstairs neighbor and friend, "an elderly" eighty-three-year-old, generally capable of running errands

---

[1] We use initials to protect the privacy of the victim.

and taking care of herself, but by no means "active." She passed away before trial and was therefore unable to describe her sexual assault to the jury in person.

According to the testimony of A.F., R.B. called her on July 23, 2015, scared and crying, and said "I got raped, I got raped." A.F. rushed down to R.B.'s apartment, where she found R.B. disheveled, crying, wet, with blood "all over" her torso. A.F. also saw blood on the bedroom and bathroom doors "like someone had dragged along a body." A.F. testified that R.B. had told her "Cliff's nephew," who R.B. had seen before but did not know well, was the man who raped her. R.B. also told A.F. that defendant had a knife and dragged her into the bedroom by the hair before raping her. A.F. noted that R.B. was walking with a limp. R.B. told A.F. that "the way he pushed her legs back" injured her hip.

A.F. asked R.B. if she had called 9-1-1. R.B. responded, "No. He said he would kill me if I called the police." A.F. then called 9-1-1. A short time later, Sergeant Ryan Knight, Patrolman Colton Gemenden, and another officer arrived at R.B.'s apartment. According to the officers, when they entered the apartment, R.B. was sitting on the couch wearing a white nightgown that was "half on/half off her top." The officers described R.B. as disheveled, visibly shaken, very frightened, and under "extreme distress." R.B. was breathing heavily and

repeatedly stated that she could not breathe. Sergeant Knight saw lacerations on R.B.'s arms and a "dark stain" that "appeared to be blood" on the couch.

Sergeant Knight was wearing a body camera that recorded his interactions with R.B. and A.F. Pursuant to a pre-trial order entered by the trial court, only the first minute of the video was played for the jury. According to the transcript, the jury heard the following statements, which began without prompting and without any questions from the officers:

> R.B.: Hi.
>
> SGT. KNIGHT: Hello.
>
> A.F.: Okay. She'll tell you the story.
>
> R.B.: --
>
> SGT. KNIGHT: Okay.
>
> A.F.: And he's in the neighborhood. You got to pick him up.
>
> SGT. KNIGHT: Okay.
>
> R.B.: He raped me.
>
> SGT. KNIGHT: Okay. When this happen?
>
> A.F.: Just now.
>
> R.B.: His nephew is -- I believe a --
>
> SGT. KNIGHT: Okay.

A-5245-16T4

R.B.: I no name [sic]. He knocked on my door. I say, what happened. He said, no, it's time to talk to me. And right away he grabbed me right here. He took my clothes –

SGT. KNIGHT: This happened here?

A.F.: Yes.

R.B.: Yes.

A.F.: Yes.

SGT. KNIGHT: Okay.

R.B.: And then he took me to my bed.

SGT. KNIGHT: Okay. When did he --

R.B.: He -- The guy lived in the last apartment.

SGT. KNIGHT: Black guy?

A.F.: Yeah.

R.B.: Yeah.

A.F: The uncle lives at 81. The uncle will tell you the address of where he lives. He lives there.

SGT. KNIGHT: She -- you -- we don't know a name, though?

A.F.: No.

R.B.: And he told me --

A.F.: Because the other day he confronted me.

5

R.B.: -- if I called the police he's gonna kill me. Now I'm afraid.

A.F.: Yeah. He said if she called the police he'll kill her. [2]

An examination of R.B.'s apartment revealed blood in several locations, including on a pillow on the couch, the bathroom door, the bedroom door, and on a piece of clothing on R.B.'s bed. In addition, the bed and couch were disheveled.

R.B. was taken to the hospital, where she was examined by an emergency room physician and a certified sexual assault nurse examiner. The physician noted "a skin tear on her upper extremity," "blood . . . externally around her vaginal area," and "tenderness in her chest wall and abdominal wall," indicative of blunt-force trauma. During a genital examination, the nurse examiner found bleeding, swelling, and tenderness around R.B.'s vagina and posterior fourchette. She also noted petechiae – blood collected under the skin – underneath R.B.'s right eye over her cheek. The nurse observed a three-centimeter skin tear, a large area of petechiae and bruising on her right arm, a

---

[2] The State argues the trial transcript fails to reflect R.B.'s statement on the video, "His uncle lives at the last apartment. I know him." Because defendant argues he and R.B. had consensual sexual relations on the day in question, R.B.'s identification of defendant as her assailant is not disputed.

significant bruise on the left side of her hip, and petechiae on her left forearm. R.B. also had swelling, bruising, and soreness on the outer part of her anus.

The examination, which ordinarily would have been conducted in a private room, took place in the emergency department because the nurse determined that R.B. could not be moved "because of the pain that she had not only with her ribs but . . . her arms, her legs, and she had vaginal bleeding." When the nurse attempted to move her, R.B. had trouble breathing and repeatedly grabbed her ribs on the right side. As a result, the nurse could not examine R.B.'s back.

During the examination, R.B. repeatedly told the nurse that the sex was not consensual and that she told her assailant to stop and that she was in pain. The nurse found R.B.'s injuries to be "very consistent" with sexual assault, but acknowledged that due to R.B.'s age, the injuries could have been caused by consensual sex. Although x-rays taken on the night in question did not reveal any fractures, a few days later R.B. complained of pain. X-rays taken on a later date revealed non-displaced fractures of two ribs and a lung contusion on her right side.

The evening of the assault, defendant arrived at the police station with his pastor after purportedly taking a nap in the woods and hearing police were

looking for him.   Detective Butler took defendant's statement, which was recorded and played for the jury at trial.   Defendant admitted to Butler that he had sex with R.B., but claimed the encounter was consensual.   He stated that while he was "kind of buzzed" from cognac, wine, and marijuana, he went to R.B.'s apartment to give her a few dollars to repay her for her generosity towards his uncle.   According to defendant, R.B. invited him in for a cigarette, and while the two of them sat in the living room, she began showing him old pictures of herself that "got him excited."   He stated he and R.B. began having consensual sex on the couch, but that R.B. was worried someone would come to the front door, so she "ran into her bedroom" where the two continued having sex. Defendant stated that although R.B. was shouting in pleasure, he stopped having sex with her when she said it was starting to hurt and that she thought she was going to have a heart attack.   Defendant stated he thought he was "doing the world a favor" because she was "an old lady" and had not had sex since 1985.

Defendant admitted that he might have been too rough with R.B., stating that he "wasn't that gentle with her" but that he "didn't beat her up or nothing like that."   He denied punching R.B., but admitted giving her "a little tap" on the side of her head.   He said he did not hit her again because she expressed displeasure with the action.   When asked how R.B. might have obtained her

8

bruises, defendant said the bruising might have been "grab marks" from him holding her because "she's an older lady, she's not limber." Defendant told the detective that he "should have stopped from like the first resistance."

Defendant said that when he and R.B. finished having sex, she said, "Oh, don't worry, I'm not going to call the cops" and he responded, "All right . . . [w]ell if you do, you do." Defendant said R.B. invited him back later that evening for more sex. He told the detective that the encounter lasted about twenty minutes, after which he was "freaked out," and he went to his uncle's house before meeting his pastor, who brought him to the police station.

A grand jury indicted defendant, charging him with: (1) first-degree aggravated sexual assault on a helpless or incapacitated victim, N.J.S.A. 2C:14-2(a)(7) (count one); (2) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); (3) third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count three); and (4) first-degree aggravated sexual assault by force or coercion, causing severe personal injury, N.J.S.A. 2C:14-2(a)(6) (count four).

In a November 16, 2016 written opinion, the trial court decided the States' motion in limine to admit three categories of hearsay statements by R.B. The court found the following admissible as statements of then existing mental, emotion, or physical condition, N.J.R.E. 803(c)(3): (1) the statement of R.B. to

A.F. on the telephone immediately after the events in question that she had been raped; (2) the statement of R.B. to A.F. in R.B.'s apartment that she had not yet called 9-1-1 because the rapist threatened to kill her if she called police; (3) the statement of R.B. to A.F. that her attacker was "Cliff's nephew;" (4) R.B.'s statement to Sergeant Knight when he entered R.B.'s apartment that the attacker raped her; and (5) the statement of R.B. to Sergeant Knight that the rapist threatened to kill her if she called the police. The court also concluded that statements (1), (2), and (3) were admissible as excited utterances, N.J.R.E. 803(c)(2). The court found any remaining statements made by R.B. to A.F. while they waited for police, as well as R.B.'s other statements as recorded on the officer's body camera video, were not admissible.

The court also concluded that admission of the statements did not violate defendant's rights under the federal and State Confrontation Clauses, U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10, because R.B.'s hearsay statements were not testimonial. The court found the statements, three of which were made to someone who was not a law enforcement officer, were not made for investigative purposes but to seek aid and protection in what R.B. perceived to be an on-going emergency. In light of the trial court's decision, approximately one minute of the officer's body camera video was played for the jury.

10

The matter was tried before a jury over four days. Defendant testified in his defense, describing in great detail his version of events as a consensual sexual encounter. He testified that during the encounter he knocked into a lamp on a nightstand, and R.B. reached for the lamp and fell in between the nightstand and the bed. He opined that this is how she got scratches and bruises on her arm. He testified that R.B. could not stand back up on her own after falling, so he "grabbed her by the other arm where . . . the other bruise is" and "pulled her up quick" to get her back on the bed. He acknowledged that he questioned whether it was "a good idea" to recommence sexual relations with R.B., but she said "I want my last time to be with you" and, although she looked "like kind of a sad, broken-down old lady[,]" he continued to have sex with her. He testified that this was what he referred to as "the first resistance" when he was interviewed by the detective. He admitted that he thereafter "popped her in the head and asked her if she like[s] that," figuring that she "like[d] it rough."

Defendant testified that when they were through having sex, R.B. told him that this was not the first time she "got raped" but assured him that she would not call the police. He testified that he responded, "well, if you feel like you have to call the police, then call them." According to defendant's testimony, he

11

walked R.B. to the bedroom and put a nightgown on her and then she "thanked" him before he left.

At the close of the State's proofs, defendant moved for a judgment of acquittal. The court denied the motion. The jury thereafter found defendant guilty of first-degree aggravated sexual assault on a helpless or incapacitated victim (count one), and simple assault, as a lesser-included offense of count two. The jury acquitted defendant on the remaining counts. The court merged the simple assault conviction into the first-degree aggravated sexual assault conviction and sentenced defendant on count one to a twenty-year prison term, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

This appeal followed. Defendant raises the following arguments for our consideration:

> POINT I
>
> COUNT ONE SHOULD NOT HAVE BEEN SUBMITTED TO THE JURY BECAUSE THERE WAS NO EVIDENCE THAT R.B. WAS "PHYSICALLY HELPLESS" AS REQUIRED BY N.J.S.A. 2C:14-2(a)(7). THIS ERROR WAS COMPOUNDED BY THE COURT'S FAILURE TO CHARGE THE CONSENT DEFENSE, WHICH WAS THE ONLY ISSUE IN THE CASE. TOGETHER, THESE ERRORS DENIED DEFENDANT A FAIR

TRIAL, AND MANDATE REVERSAL OF THE CONVICTION. (Partially raised below).

A. The Erroneous Denial of the Motion for a Judgment of Acquittal on N.J.S.A. 2C:14-2(a)(7) at the Close of the State's Case.

B. The Failure to Charge Consent as a Defense to N.J.S.A. 2C:14-2(a)(7). (Not Raised Below).

POINT II

DEFENDANT WAS DENIED HIS RIGHT TO CONFRONT HIS ACCUSER BY THE INTRODUCTION OF A BODY CAMERA VIDEO CONTAINING TESTIMONIAL HEARSAY DECLARING, "HE RAPED ME" AND "HE TOLD ME . . . IF I CALLED THE POLICE HE'S GONNA KILL ME."

II.

We use the same standard as the trial judge in reviewing a motion for judgment of acquittal at the close of the State's case. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 459 (1967).]

13

Under Rule 3:18-1, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

We are satisfied that the evidence in this case, viewed in its entirety and giving the State all favorable inferences therefrom, was sufficient to allow a reasonable jury to find defendant guilty of first-degree aggravated sexual assault on a helpless or incapacitated victim.

A person is guilty of first-degree aggravated sexual assault under N.J.S.A. 2C:14-2(a)(7)

> if he commits an act of sexual penetration with another person . . .
>
>    . . . .
>
> whom the actor knew or should have known was physically helpless or incapacitated, intellectually or mentally incapacitated, or had a mental disease or defect which rendered the victim temporarily or permanently incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent.

Defendant was charged in the indictment under all three theories of culpability in this subsection; however, at the charge conference, the State

acknowledged only the "physically helpless" theory applied and proceeded on that theory alone. Physically helpless is defined in the statute as "that condition in which a person is unconscious or is physically unable to flee or is physically unable to communicate unwillingness to act[.]" N.J.S.A. 2C:14-1(g).

There is ample evidence in the record on which a reasonable jury could have concluded that the elderly R.B. was physically unable to flee from the younger and stronger defendant. R.B. was more than twice the age of defendant, a man with military training who worked in the physical field of seismic drilling. In the video footage from the police officer's body camera shown to the jurors, R.B. is clearly depicted as a frail, elderly woman who does not move about easily. A.F. described R.B. as an "elderly eighty-three" who was not particularly "active." See State v. Wakefield, 190 N.J. 397, 417, 511-12 (2007) (evaluating "knowledge of victim's helplessness" factor in death penalty proportionality review and noting, "[t]he particular vulnerability of elderly victims has been a matter of concern to us before. It cannot be disputed that victims of the ages of Richard [(seventy)] and Shirley Hazard [(sixty-four)] are less able to defend themselves than younger, adult victims."); State v. Papasavvas, 170 N.J. 462, 467, 482, 485 (2002) (noting victim, sixty-four, was vulnerable due to her age and because she was living alone).

Moreover, the record contained undisputed evidence of the bruising, cuts, bleeding, and other physical injuries R.B. suffered. A reasonable jury could view R.B.'s injuries, inflicted by defendant as he manhandled her, to be evidence of her physical inability to escape from him.

We disagree with defendant's argument that if the evidence against him is sufficient for a finding that R.B. was physically unable to flee from him, then N.J.S.A. 2C:14-2(a)(7) will apply every time a rapist is bigger or stronger than a victim. The relative body size and strength of a defendant and a victim is not determinative of physical inability to flee. The statutory definition of physically helpless encompasses "a variety of factual scenarios" to be determined by a jury. State v. Rush, 278 N.J. Super. 44, 47 (App. Div. 1994). Here, in addition to the physical differences between R.B. and defendant, the record contains evidence of R.B.'s age, frailness, mobility, and injuries.

III.

It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379 (1988). However, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v.

16

Singleton, 211 N.J. 157, 182 (2012).  Therefore, "the failure to object to a jury instruction requires review under the plain error standard."  Wakefield, 190 N.J. at 473.

> As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

The mere possibility of an unjust result is not enough to warrant reversal of a conviction.  State v. Jordon, 147 N.J. 409, 422 (1997).  "The error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'"  State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

"[W]e must read the charge as a whole."  State v. Townsend, 186 N.J. 473, 499 (2006).  "[T]he prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances including all of the instructions to the jury, [and] the arguments of counsel."  Ibid. (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)).  A defendant is entitled to a charge "that is accurate and that does not, on the whole, contain prejudicial error."  State

v. Labrutto, 114 N.J. 187, 204 (1989). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

The court instructed the jury with respect to the consent defense for count four, first-degree aggravated sexual assault by force or coercion, causing severe personal injury, N.J.S.A. 2C:14-2(a)(6), and its two lesser-included offenses. Defendant never requested, however, that the jury be instructed on consent as a defense to count one and never objected to the absence of any such instruction. For the first time on appeal, defendant argues the absence of such instruction on count one constitutes plain error.

We disagree. During the trial, defendant took the position that his sexual activity with R.B. on the day in question was consensual. He testified at length, providing the jury a detailed account of what he contended was consensual encounter with R.B. His counsel argued in summation, which included a specific reference to count one, that the jury should acquit defendant because R.B. consented to having sexual relations with him. As noted above, the court instructed the jury with respect to consent as a defense, albeit when discussing count four, and its lesser included offenses. It is clear the jury rejected

defendant's version of events and instead found credible the overwhelming evidence presented by the State that defendant sexually assaulted R.B.

We disagree with defendant's argument that the court should have sua sponte instructed the jury with respect to a consent defense on count one. When considering whether to charge a jury sua sponte with an affirmative defense, a trial court must apply the standard applicable to its duty to charge the jury sua sponte with a lesser-included offense. Walker, 203 N.J. at 86-87. A trial court need not "sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain" the defense. State v. R.T., 205 N.J. 493, 509 (2011) (Long, J., concurring) (quoting State v. Choice, 98 N.J. 295, 299 (1985)). Rather, when "counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." Walker, 203 N.J. at 87 (footnote omitted). "[T]he need for the charge must 'jump off' the proverbial page." R.T., 205 N.J. at 510 (Long, J., concurring).

Apart from defendant's testimony, the record in no way suggested that R.B. consented to having sexual relations with defendant. To the contrary, the record contained a video recording of R.B. shortly after the assault, appearing disheveled, upset, bloody, bruised, scared defendant would seek revenge against

her because A.F. called the police, and exhibiting difficulty breathing. In addition, the record contained evidence of the significant injuries R.B. suffered, including bruising, broken ribs, and vaginal bleeding.

Further, defendant's account of his encounter with R.B. was not completely exculpatory. Defendant admitted striking R.B. in the head while having sex with her and being so rough that he may have caused her bruising. He recounted to a detective patently unbelievable and implausible details, such as R.B., whose limited mobility is evident on the videotape, running to the bedroom to continue a sexual encounter. In addition, defendant told a detective that he should have stopped "after the first resistance" from R.B., and admitted that immediately after the encounter R.B. said she had been raped and mentioned calling the police. A defense of consent to count one does not "jump off the page" of the trial transcripts.

IV.

Both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution provide that in a criminal trial the accused has the right "to be confronted with the witnesses against him[.]" U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "Our legal system has long recognized that cross-examination is the 'greatest legal engine ever invented for

the discovery of truth.'" State v. Basil, 202 N.J. 570, 591 (2010) (quoting California v. Green, 399 U.S. 149, 158 (1970)). However, "[i]n an appropriate case the right of confrontation will yield to other 'legitimate interests in the criminal trial process, such as established rules of evidence and procedure designed to ensure the fairness and reliability of criminal trials.'" State v. Castagna, 187 N.J. 293, 309 (2006) (quoting State v. Garron, 177 N.J. 147, 169 (2003)).

Out-of-court statements found admissible against a defendant in a criminal proceeding under an exception to the hearsay rule implicate the right to confrontation. "In Crawford v. Washington, [541 U.S. 36 (2004)], the United States Supreme Court declared that the Sixth Amendment's Confrontation Clause prohibited the use of an out-of-court testimonial statement against a criminal defendant unless the witness was unavailable and the defendant was given a prior opportunity to cross-examine her." Basil, 202 N.J. at 591.

A testimonial statement is one that "is the equivalent of 'bear[ing] testimony' against an accused." Ibid. (alteration in the original) (quoting Crawford, 541 U.S. at 51). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet

an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822 (2006). Statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Ibid.

"[A] declarant's narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is testimonial." State ex rel. J.A., 195 N.J. 324, 348 (2008). Statements implicating "the Confrontation Clause include both testimonial statements elicited by the police during interrogations . . . and testimonial statements volunteered to the police[.]" Basil, 202 N.J. at 591-92.

"[T]here may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 562 U.S. 344, 358 (2011). "An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.'" Id. at 360. "The government bears the burden of proving the constitutional admissibility of a statement in response to a Confrontation Clause challenge." Basil, 202 N.J. at 596.

Defendant argues the out-of-court statements admitted into evidence were testimonial, as they were narratives about a completed crime that occurred after any danger had subsided.[3]  Our review of the record in light of the applicable precedents leads us to affirm the court's decision for the reasons stated in the court's November 16, 2016 written decision.  There is sufficient, credible evidence in the record supporting the court's determination that R.B.'s statements were made for the purpose of securing assistance from A.F. and the police in what she perceived to be an ongoing emergency.  Defendant, who lived nearby, threatened R.B. with further harm were she to call the police.  The record supports a determination that she feared his return and was justifiably concerned that he may have remained nearby after the assault.

To the extent we have not specifically addressed any of defendant's remaining arguments it is because we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3]  Defendant does not challenge the court's conclusion that the statements were admissible exceptions to the hearsay rule.  Nor does defendant challenge R.B.'s identification of her assailant as "Cliff's nephew."

A-5245-16T4