**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5290-17T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAQUIL JOHNSON, a/k/a
JAQUILA JOHNSON,

      Defendant-Appellant.

_____

Argued November 2, 2020 – Decided January 26, 2021

Before Judges Messano and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-12-2837.

Susan Lee Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Daniel V. Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).

Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Valeria Dominguez, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendant Jaquil Johnson of the lesser-included charge of second-degree passion-provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), in the shooting death of Calvin Auston, and unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). The jury acquitted defendant of possession of a firearm for an unlawful purpose. N.J.S.A. 2C:39-4(a). The judge granted the State's motion for an extended term pursuant to N.J.S.A. 2C:44-3(a) and sentenced defendant to an eighteen-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the manslaughter conviction, and a concurrent ten-year term with a five-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on the weapons offense.

Defendant raises the following points on appeal:

> POINT I
>
> THE TRIAL JUDGE FAILED TO ENSURE DEFENDANT'S RIGHTS TO A FAIR AND IMPARTIAL JURY, DUE PROCESS AND CONFRONTATION, WHEN HE FAILED TO VOIR DIRE THE JURORS AFTER MEMBERS OF THE VICTIM'S FAMILY WORE SHIRTS TO COURT DISPLAYING A PHOTOGRAPH OF THE VICTIM AND THE WORDS "REST IN PEACE." (NOT RAISED BELOW)

A-5290-17T1

POINT II

THE COURT ERRED IN PERMITTING A KEY STATE'S WITNESS TO TESTIFY IN HANDCUFFS AND PRISON GARB. (PARTIALLY RAISED BELOW)

POINT III

THE PROSECUTOR COMMITTED MISCONDUCT IN SUMMATION, INCLUDING WHEN SHE URGED, WITHOUT SUPPORT IN THE RECORD, THAT DEFENDANT'S HAVING LEFT NEW JERSEY REFLECTED A CONSCIOUSNESS OF GUILT, AND THE COURT ERRED IN FAILING TO CORRECT THE PROSECUTOR'S ERRORS.

POINT IV

IN SENTENCING THE DEFENDANT, THE COURT ERRED IN MISSTATING THE APPLICABLE SENTENCING RANGE AND FINDING, AS AN AGGRAVATING FACTOR, THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

Defendant raises the following issues in a pro se supplemental brief:

POINT ONE

THE TRIAL COURT'S JURY INSTRUCTIONS ON ELEMENTS OF MURDER AND ITS LESSER INCLUDED OFFENSES WAS CONTRADICTORY, CONFUSING AND LESSENED THE STATE'S BURDEN, THUS DEPRIVING DEFENDANT DUE

3

PROCESS AND A FAIR TRIAL . . . . [NOT RAISED BELOW][1]

POINT TWO

THE DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS WHEN THE TRIAL COURT FAILED TO CHARGE THE JURY ON SELF-DEFENSE . . . . [NOT RAISED BELOW]

POINT THREE

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE PROSECUTOR SOUGHT TO APPEAL TO THE JURORS SYMPATHY AND PREJUDICES TO LESSEN THE STATE'S BURDEN . . . . [NOT RAISED BELOW]

POINT FOUR

THE TRIAL COURT'S FAILURE TO FIND MITIGATING FACTORS WHICH DEFENDANT WAS ENTITLED TO RECEIVE, VIOLATED THE SENTENCING GUIDELINES AND DEPRIVED DEFENDANT OF DUE PROCESS [NOT RAISED BELOW]

Considering the record and applicable legal standards, we affirm defendant's conviction and remand the matter for re-sentencing consistent with this opinion.

---

[1] We omitted the subpoint contained in defendant's brief, as well as citations in the point headings to the United States and New Jersey Constitutions.

I.

On New Year's Eve, 2014, a small group of people gathered for a party at the home of Jacqueline Auston. Her son, Calvin, was visiting from North Carolina. Also present were Jacqueline's cousin, Latisia Dodd, and a friend of Jacqueline's niece, Kianna Waiters.[2] Soon, an argument erupted between Dodd and Waiters, and Jacqueline told them to "take it outside," which they did. Someone called Dodds's husband, Jihad Jones, who was also a friend of the family, and told him Waiters had been "jumped" in a fight. Jones arrived with defendant.

Calvin and his brother Haneef got into a physical altercation with Jones and defendant. What exactly happened was the subject of confusing testimony, with one witness describing the scene as "chaotic." Ultimately, a shot rang out. Calvin was struck in the abdomen and later died at the hospital.

Jones left with defendant. In a statement to police, Jones said defendant "pull[ed] . . . out [the gun] just to back [Calvin] off of him and the gun went

---

[2] We apologize for the informality of using the first names of the Auston family members, but we do so only to avoid confusion.

A-5290-17T1

off."[3] No one else saw who fired the shots, but Jacqueline and Haneef provided a general description. Dodd did not see the shooting, but she later identified defendant in an out-of-court photographic array as the man who arrived with Jones, had a gun in his hand, and ran after the shot was fired.

Before and after the shooting, Khristine Miles was with defendant, who she identified at trial, at a gathering in another apartment. Miles knew defendant and said he spoke of having a gun, a "forty." After the shooting, when defendant and Jones returned to the party, defendant told Miles he had gotten into an altercation and "had to defend himself." Defendant said he did not mean to shoot anyone. Miles also recalled that when defendant and Jones returned, Jones was without his jacket. Miles said Jones and defendant left again to try and find the missing jacket.

At the scene of the shooting, police recovered a jacket that contained court documents belonging to Jones, who in turn, in his statement, identified defendant. They also recovered a .40 caliber shell casing and a bullet fragment on the walkway in front of Jacqueline's townhouse.

---

[3] Although called as a State's witness, the prosecutor introduced Jones' videotaped statement to police after the judge conducted a Gross hearing. State v. Gross, 121 N.J. 1 (1990).

An arrest warrant was issued for defendant on January 13, 2015; he was not arrested until May 5, 2015, in North Carolina. Defendant did not testify or call any witnesses.

## II.

After the jury was selected and sworn, the prosecutor and defense counsel gave opening statements, and Jacqueline and another State's witness testified, the prosecutor prepared to call Jones as a witness. Anticipating the need to redact some of Jones' statement before it was disclosed to the jury, the judge released the panel for lunch. Apparently, members of both defendant's and the victim's family were present, and the judge cautioned both to stay clear of the jurors as they exited the courtroom and outside of court. The judge then said without the jury present:

> Counsel, before we address the issue with regard to the statement . . . , I just wanted to indicate that my sheriff's officer brought to my attention a few of the family members had t-shirts on that said "Rest in Peace[,]" and I think a picture of the victim in this case. I intend to just let the jurors know — I don't think it's appropriate for me to tell people they can't wear or honor their lost relative; however, I just want to make sure the jurors know that that has nothing to do with the evidence in this case and it should have no influence on their consideration of the evidence in any way, shape or form.

Both the prosecutor and defense counsel agreed with the judge's course of action; defense counsel did not seek any further relief.

When the jury returned from lunch, the judge said:

> I just wanted to let you know, this morning . . . one of the Sheriff's Officers pointed out that some of the members in — in the audience had some shirts on that had words to the effect of rest in peace and a — a photo of the victim in this case.
>
> I just want to let you know that that should have no bearing whatsoever on your view of the evidence in this case or testimony.
>
> Certainly, victims are allowed to remember a loved one, but that has nothing to do — you're not to base [sic] this case based upon any passion, prejudice or sympathy in this case, only on the facts in the testimony. So that should in no way influence your view of the testimony in any way, shape or form. So[,] I just want to make that clear to you again.

Defendant was represented by two attorneys throughout trial; neither one objected to the judge's charge nor requested anything further.

Pursuant to Article I, paragraph 22 of the New Jersey Constitution, the Legislature enacted the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38. In 2012, the Legislature passed "Alex DeCroce's Law," L. 2012, c. 27, which ostensibly strengthened crime victim's rights and added a new provision reiterating the right "in any homicide prosecution" of a "victim's survivor" to

A-5290-17T1

"display directly to the sentencing court a . . . still photograph, a computer-generated presentation, or a video presentation of the victim" that was "taken before the homicide[.]" N.J.S.A. 52:4B-36.1(a).[4] The Legislature extended this right, in a modified way, to "any judicial proceeding involving the defendant" by providing:

> A victim's survivor may . . . wear a button not exceeding four inches in diameter that contains a picture of the victim, if the court determines that the wearing of such button will not deprive the defendant of his right to a fair trial under the Sixth Amendment of the United States Constitution and Article I of the New Jersey Constitution. Other spectators at such judicial proceedings may also wear similar buttons if the court so determines. If the victim's survivor seeks to wear the button at trial, the victim's survivor shall give notice to the defendant and to the court no less than [thirty] days prior to the final trial date.
>
> [N.J.S.A. 52:4B-36.1(b).]

Defendant argues the statute obviously does not permit spectators to wear t-shirts displaying a homicide victim's picture, much less including the phrase, "Rest in Peace." We agree. Moreover, the Legislature itself recognized the

---

[4] See Assemb. Comm. Statement to S. 2380 (June 18, 2012) ("The bill clarifies and expands the current right of a victim's survivor to display a photograph of a homicide victim, transferring that right to a new section of law (section 2 of the bill) and adding the right of a victim's survivor to wear a button containing the victim's picture." (emphasis added)).

constitutional ramifications of such displays, limiting the size of any "button" so as not to impinge on a defendant's right to a fair trial. See, e.g., State v. Hess, 207 N.J. 123, 156–60 (2011) (discussing prejudicial effects of victim-impact statements and videos displayed at sentencing).

It appears that no one in the courtroom, including the judge, was familiar with the statute.[5] However, defendant's precise argument is not that the judge should have prohibited spectators from wearing a shirt with the victim's photo. See State v. Castoran, 325 N.J. Super. 280, 284–85 (App. Div. 1999) (approving of trial judge's order forcing defendant to change her shirt as within the court's discretion "to maintain decorum and prevent conduct which may improperly impact on the trial").

Rather, defendant argues the judge was required sua sponte to voir dire the jurors regarding their observations of the shirts and what, if any impact, that may have had on a juror's impartiality. Indeed, we agree with defendant that the critical issue is not whether the shirts violated the statute, but whether their presence in the courtroom so tainted the jury that defendant was denied a fair trial. See, e.g., State v. Loftin, 191 N.J. 172, 187 (2007) ("A defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair

---

[5]  No published case has addressed N.J.S.A. 52:4B-36.1(b).

trial." (citations omitted)); State v. Brown, 442 N.J. Super. 154, 179 (App. Div. 2015) ("The Court has stressed that jurors must be 'as nearly impartial "as the lot of humanity will admit."'" (quoting State v. Singletary, 80 N.J. 55, 62 (1979))).

Because defendant made no request to voir dire the jurors at trial, we must consider whether the failure to do was plain error, i.e., error that was "clearly capable of producing an unjust result." R. 2:10-2. "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting State v. Williams, 168 N.J. 323, 336 (2001)). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" State v. Santamaria, 236 N.J. 390, 404 (2019) (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

The Court has said that

> [u]ltimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.

[State v. R.D., 169 N.J. 551, 559 (2001).]

As a result, we apply an abuse of discretion standard to the judge's decision. Ibid. As the Court subsequently made clear, "the overarching relevant inquiry is not whether the trial court committed error, but whether it abused its discretion." State v. Wakefield, 190 N.J. 397, 496 (2007) (citing R.D., 169 N.J. at 559).

Here, it was the judge who brought the shirts to the attention of the attorneys, and it was the judge who concluded that any possible prejudice was best addressed by issuing a curative instruction. He did so, in the clearest terms, immediately after the jury returned from its luncheon recess. Defense counsel did not request any other relief. Under the circumstances, we certainly cannot conclude the judge mistakenly exercised his discretion.[6]

To be sure, in the future, trial judges should acquaint themselves with N.J.S.A. 52:4B-36.1(b). We do not necessarily conclude that the statute defines the outer boundaries of the court's discretion regarding such displays during

---

[6] In his brief, defendant, in a single sentence suggests alternatively we should remand for the judge to create a more complete record, e.g., how many people wore the shirts and for how long were those people in the courtroom with the jury present. We see no need to do that. The incident occurred after Jacqueline's testimony, and nothing in the record indicates she wore such a shirt or that the shirts appeared again during the trial.

trial. However, the procedure for pre-trial notice is undoubtedly intended to permit a defendant to lodge a timely objection, and for the judge to weigh in a reasoned manner the exercise of her or his discretion.

III.

Jones was serving a sentence in State prison for "[e]luding and aggravated assault" when the State called him as a witness. Before Jones was sworn and outside the jurors' presence, the following occurred:

> Judge: Can you hold up the jurors for a minute[]. Take the cuffs off.
>
> Court Officer: It comes – you want them completely off?
>
> Judge: The cuffs off. Yes. He – he can't have cuffs in front of the jurors, yes.
>
> Court Officer: Uh, I mean, he is in custody, though.
>
> Judge: I understand. But he's not – he's not supposed to have cuffs in front of jurors. Jurors shouldn't see – shouldn't see him in cuffs.
>
> Court Officer: Well, not – but not in his case.
>
> Prosecutor: I think the only person is the defendant can't be seen.
>
> Court Officer: Yes.
>
> Defense Counsel: Yes.

13

Prosecutor: He can. He's – he's a State prisoner.

Court Officer: He's in custody.

Judge: It's not – it's not normally. Does anybody have any objection to the cuffs staying on?

Prosecutor: No Judge. They're going to hear he's in custody. I – I don't object.

Defense Counsel: Yes.

Judge: All right. Then that's fine.

Court Officer: If not, <u>he would have been dressed</u>.[7]

Judge: All right. All right. We could bring them in.

Defense Counsel: He's in custody.

Prosecutor: Yes. They've already heard he's in custody, actually. We opened to it.[8]

[(emphasis added).]

Defendant now contends it was error to permit Jones to testify in prison garb and handcuffs and for the judge not to provide the appropriate model jury

---

[7] We assume from the court officer's words that Jones was also in prison garb, although there is no specific reference to his clothing in the record.

[8] The prosecutor referenced Jones being in State prison during her opening statement.

A-5290-17T1

charges in this regard. He also argues trial counsel provided ineffective assistance by not objecting or requesting the instructions.

In State v. Kuchera, a State's witness, i.e., a co-defendant who had pled guilty and was about to testify against the defendant, appeared at trial in prison garb and leg shackles. 198 N.J. 482, 488–90 (2009). The defendant posed no objection, id. at 489, however, on appeal, he contended the court should have held "a hearing on the security issue and [issued] an appropriate jury instruction in the event that the hearing led to restraints being kept on [the co-defendant]." Id. at 493.

The Court held that "witnesses in criminal cases presumptively should be allowed to testify without restraints." Id. at 496. However, the Court made clear that whether to require restraints lies within the trial judge's discretion, guided by "a straightforward, candid colloquy among the court, counsel and security staff[.]" Ibid.

The Court also said that

> regardless of the identity of the proponent of a witness, trial courts have an independent obligation to gauge whether a witness is a security risk sufficient to justify the use of restraints . . . . [T]rial courts must inquire as to the bases for the proposal and must be satisfied that, for security concerns and in the proper exercise of judicial discretion, some level of restraints is appropriate . . . . [S]uch inquiry and conclusions must

15

> be spread on the record, to allow meaningful appellate review . . . . [I]f the trial court in fact does order the use of restraints, <u>the jury must be instructed</u> "in the clearest and most emphatic terms that it give such restraint no consideration whatever in assessing the proofs and determining guilt."
>
> [<u>Id.</u> 496–97 (emphasis added) (quoting <u>State v. Artwell</u>, 177 N.J. 526, 538 (2003)).]

It referred to committee the "adoption of a standard charge concerning the appearance of a trial witness in restraints, consistent with the principles to which we have adverted." <u>Id.</u> at 497 n.4. The result was the adoption of two model jury charges, one to use for witnesses appearing in restraints, a second to use when the witness appears in prison garb. <u>See</u> <u>Model Jury Charges (Criminal),</u> "Witness – Testifying While Wearing Restraints" (approved May 12, 2014); <u>Model Jury Chagres (Criminal),</u> "Witness – Testifying in Jail Garb or Prison Garb" (approved May 12, 2014). In <u>Kuchera</u>, the Court ultimately held that permitting the testifying co-defendant to appear in leg shackles that were likely unobserved by the jury was not plain error. 198 N.J. at 498.

Initially, we reject the State's contention that somehow the judge's decision in this case reflects the "informed . . . exercise [of the court's] discretion." <u>Id.</u> at 496. From the colloquy quoted above, it is clear that although nearly a decade had passed since the Court's holding in <u>Kuchera,</u> neither the

prosecutor nor defense counsel were aware of it, and both led the judge — who expressed initial concern for having Jones testify in handcuffs — astray by telling him the prohibition only applied to defendants.

We equally reject defendant's implication that trial counsel did not consent or acquiesce to the procedure. A fair reading of the colloquy demonstrates otherwise. See State v. A.R., 213 N.J. 542, 561 (2013) (noting as "settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))).

If not invited error, the issue becomes whether it was plain error to permit Jones to testify in handcuffs and prison garb, particularly without any curative instruction to follow. We conclude that any error in this regard was not "clearly capable of producing an unjust result[.]" R. 2:10-2.

From the onset of trial, the jury knew Jones was serving a prison sentence. Defendant contends Jones' appearance before the jury in handcuffs and prison garb tainted its fair consideration of the evidence, because the jury would associate defendant with this convicted person, who, the State contended, was with defendant at the shooting. However, although Jones' statement supported the State's case, his live testimony before the jury did not. Jones denied knowing

defendant, or that defendant was with him at the time of the shooting. Jones also testified that he feared being accused himself and was under the influence when he gave his statement to police.

Jones admitted fabricating defendant's involvement, and, after feigning any familiarity with firearms, acknowledged defense counsel's assertion that he had been previously "convicted of having a firearm." In her summation, defense counsel highlighted Jones' incarceration, the fact that he was supplying drugs at the New Year's Eve party, and that all the State's witnesses "seem[ed] to be a little bit afraid of [Jones]." In short, under the particular circumstances of this case, any error in allowing Jones to testify in prison garb or handcuffs or in failing to give the model charges was harmless beyond a reasonable doubt.[9]

## IV.

In her opening, the prosecutor told jurors that the State's witnesses were reluctant to provide information to police and reluctant to testify. In summation, she characterized the witnesses as "brave enough to come forward," and said defendant "was apprehended, not by any help of him, because you heard about his – the conduct post-shooting, after the shooting. What did he do? He

---

[9] We preserve defendant's claims of trial counsel's ineffective assistance for post-conviction relief. State v. Mohammed, 226 N.J. 71, 81 n.5 (2016).

immediately fled the scene with Jihad Jones. He was ultimately arrested down in North Carolina. And now he has a changed appearance."

After the summation, defense counsel requested a sidebar and argued the prosecutor, who never requested a flight charge, implied defendant fled to North Carolina because of his guilty conscience. The judge found "nothing improper" or "unduly prejudicial" in the prosecutor's remarks. Although the record does not reflect defense counsel asked for a curative charge, the judge said he was "not going to give any instructions."

Defendant contends these comments amounted to prosecutorial misconduct, and the judge's failure to provide a curative instruction requires reversal. Again, we disagree.

While prosecutors are entitled to zealously argue the merits of the State's case, State v. Smith, 212 N.J. 365, 403 (2012), they occupy a special position in our system of criminal justice. State v. Daniels, 182 N.J. 80, 96 (2004). "[A] prosecutor must refrain from improper methods that result in a wrongful conviction[] and is obligated to use legitimate means to bring about a just conviction." Ibid. (quoting State v. Smith, 167 N.J. 158, 177 (2001)). Even if the prosecutor exceeds the bounds of proper conduct, however, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in

order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" Smith, 167 N.J. at 181 (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

It is clear from the record that the State's witnesses were reluctant and at times evasive in their testimony. Characterizing them as "brave" was unnecessary and inappropriate. The prosecutor admitted at sidebar that she had no evidence demonstrating defendant's trip to North Carolina was predicated upon his desire to avoid investigation or apprehension. The remarks may have been better left unsaid.

However, there was evidence that defendant was at the scene of the shooting and fled with Jones. There was also evidence that police secured a statement from Jones shortly after the shooting in which he identified defendant, but police were unable to locate defendant for five months. And, there was evidence that defendant no longer wore dreadlocks when apprehended, a defining feature of the shooter relayed to police by the witnesses at the scene. Taking the entire summation in context, these brief remarks nears its closing did not deprive defendant of a fair trial, nor did the judge's discretionary decision not to provide a curative instruction require reversal.

V.

In his pro se brief, defendant raises two issues regarding the final jury charge. He contends the judge's instructions on murder permitted the jury to infer defendant acted purposefully or knowingly if the State proved motive or proved he used a deadly weapon, here, a gun. He also contends it was error to submit written copies of the charge to the jury during deliberations.

We have reviewed the judge's instructions which followed Model Jury Charge (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4(a), (b)(1) and (b)(2)" (rev. June 8, 2015), with slight alterations tailored to the facts of the case. Also, Rule 1:8-8(b)(2) requires that "the court shall submit two or more copies of its final instructions to the jury for the jury's use in the jury room during deliberations." The arguments require no further discussion in a written opinion. R. 2:11-3(e)(2).

Defendant also argues the judge should have charged self-defense. Although there was ample time for defense counsel to review the charge and submit requests or lodge objections to the judge's proposed charge, they never did.

"Our rules provide that a defendant waives the right to contest an instruction on appeal if he does not object to the instruction." State v. Torres, 183 N.J. 554, 564 (2005) (citing R. 1:7-2). "We may reverse on the basis of unchallenged error if we find error that was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). The Court has said that

> [i]n the context of a jury charge, plain error requires demonstration of "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court <u>that of itself the error possessed a clear capacity to bring about an unjust result</u>."
>
> [State v. Burns, 192 N.J. 312, 341 (2007) (second alteration in original) (emphasis added) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

In the absence of a party's request or objection, the evidence in the record must clearly indicate the need to provide the unrequested charge. State v. Alexander, 233 N.J. 132, 143 (2018); see also State v. Walker, 203 N.J. 73, 87 (2010) (applying clearly indicated standard to affirmative defense to felony murder).

However, as the Court has recognized, "[a] different and more complicated calculus pertains when reviewing a trial record for factual support for an affirmative defense that defendant did not request and may have actively opposed." State v. Daniels, 224 N.J. 168, 182 (2016). These "factors include

A-5290-17T1

whether counsel is surprised, how the case was tried, whether the defense is incompatible with defendant's position at trial, or whether the instruction would prejudice the defense in some way." State v. R.T., 205 N.J. 493, 510 (2011) (Long, J., concurring) (citing State v. Choice, 98 N.J. 295, 300–01 (1985)). "It goes without saying that a defendant who denies having committed a crime should not be required to acknowledge, either explicitly or inferentially, complicity in the event by way of a compelled affirmative defense." Id. at 511.[10] In Daniels, the Court refined the analysis even further, setting out factors to consider when the trial evidence supports an affirmative defense, even imperfectly, yet defendant objects to the charge. 224 N.J. at 186–87.

The evidence here demonstrated that the victim physically assaulted defendant, and, according to one witness, had defendant in a headlock. In his statement to police, Jones said that defendant was attempting to get the victim "off of him" when the gun discharged. However, the entire defense in the case was that defendant was never present at the scene of the shooting. In summation, defense counsel highlighted the lack of identification of defendant by any

---

[10] An equally divided Court in R.T. affirmed our reversal of defendant's conviction based on the trial court's decision to provide instructions on voluntary intoxication over defendant's objection. 205 N.J. at 493. However, in Daniels, the Court recognized that four justices, a majority of the Court, "agreed with the analysis . . . in Justice Long's concurrence" in R.T. 224 N.J. at 184.

23

witness at the scene, except for Dodd, whose out-of-court identification counsel attacked. Counsel emphasized how everyone at both gatherings was impaired from alcohol and drugs.

Unlike the defendants in R.T. and Daniels, defendant here never objected to a charge on the affirmative defense of self-defense, nor did he request it. In State v. Perry, the Court held the failure to sua sponte provide a self-defense charge, even if supported by the record evidence, was not plain error. 124 N.J. 128, 163–64 (1991). As the Court explained, "forcing counsel to incorporate defenses that pre-suppose the existence of the very fact his main method of defense contests destroys the credibility and coherence of the defense entirely." Id. at 163. We subscribe to that view in this case, and do not find plain error requiring reversal.

VI.

Although defendant does not challenge the judge's decision that he was eligible for an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a), he argues the judge misunderstood the Court's holding in State v. Pierce, 188 N.J. 155 (2006), and concluded the applicable range for any term of imprisonment was now ten-to-twenty years. He also argues the judge

misapplied the aggravating and mitigating sentencing factors to both impose an extended term and to set the term at eighteen years.

In Pierce, to meet Sixth Amendment standards, the Court explained that after determining whether a defendant met "the minimum statutory eligibility requirements for an extended-term sentence" under N.J.S.A. 2C:44-3(a), "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." 188 N.J. at 168–69. In this case, that meant a term of imprisonment between five-and-twenty years. The sentencing judge then may consider protection of the public in assessing the aggravating and mitigating sentencing factors, but a finding of the need to protect the public is "not a necessary condition" to imposing "a sentence up to the top of the extended-term range." Id. at 170.

At the start of the sentencing proceeding, the judge granted the State's motion to impose an extended term of imprisonment, noting that meant "defendant [was] now eligible to be sentenced between [ten-]and[-twenty] years." Defendant seizes on this remark as evidence that the judge misunderstood Pierce and believed he had to impose an extended term of imprisonment between ten and twenty years. The argument lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). It suffices to say that later in the

proceeding, the judge cited <u>Pierce</u> and demonstrated a complete understanding of its holding.

The judge found aggravating sentencing factors one, three, six and nine. See N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense); (a)(3) (the risk of re-offense); (a)(6) (extent of prior record and seriousness of offense); (a)(9) (need to deter defendant and others). After considering defendant's arguments regarding applicable mitigating factors, see N.J.S.A. 2C:44-1(b), the judge found none. Defendant's primary challenge is to the finding of aggravating factor one, although he also contends certain mitigating factors applied, as well as the non-statutory mitigating factor of defendant's relative youth.

"Appellate review of the length of a sentence is limited." <u>State v. Miller</u>, 205 N.J. 109, 127 (2011). As the Court has reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [<u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014) (alteration in original) (quoting <u>State v. Roth</u>, 95 N.J. 334, 364–65 (1984)).]

26

A remand may be appropriate if the judge fails to perform the required "qualitative analysis" of the factors or "considers an aggravating factor that is inappropriate to a particular defendant or to the offense at issue." Ibid. (citing State v. Kruse, 105 N.J. 354, 363 (1987); State v. Pineda, 119 N.J. 621, 628 (1990)).

Initially, we reject defendant's arguments that the judge improperly found aggravating factors three, six or nine, or improperly failed to find applicable mitigating factors. Defendant, who was twenty-five years of age at the time of the crime and twenty-nine-years old when convicted, had four prior indictable convictions, twenty-four adult arrests, multiple disorderly persons' convictions, and had violated probation several times. Defendant also had an active restraining order against him resulting from a domestic violence complaint. These findings support the judge's determinations as to those aggravating factors and the lack of any mitigating factors.

However, the judge mistakenly found aggravating factor one applied. "Aggravating factor one requires the trial court to consider '[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner.'" Id. at 74 (alteration in original) (quoting N.J.S.A. 2C:44-1(a)(1)). This factor

27

requires the judge to "review[] the severity of the . . . crime[.]" <u>Ibid.</u> (quoting

<u>State v. Lawless</u>, 214 N.J. 594, 609 (2013)). In applying this factor, the court

must "scrupulously avoid 'double-counting' facts that establish the elements of

the relevant offense." <u>Id.</u> at 75 (citations omitted). "In appropriate cases, a

sentencing court may justify the application of aggravating factor one, without

double-counting, by reference to the extraordinary brutality involved in an

offense." <u>Ibid.</u> (citing <u>State v. O'Donnell</u>, 117 N.J. 210, 217 (1989)).

Here, the prosecutor did not contend that aggravating factor one applied

at all. The judge, however, concluded there was no double-counting by its

application because "defendant's actions came . . . much closer to either

aggravated manslaughter or murder[.]" He reasoned the "jury's reasonable doubt

that the State ha[d] prove[n] the mitigating elements of passion provocation

manslaughter is not the equivalent . . . of an affirmative finding of fact that the

defendant was reasonably provoked . . . and killed before reason ha[d] sufficient

time to regain its [s]way." This was a slight misstatement of something we said

in <u>State v. Teat</u>, 233 N.J. Super. 368, 373 (App. Div. 1989) ("A jury's reasonable

doubt that the State <u>disproved</u> the mitigating elements of passion/provocation

manslaughter is not the equivalent, for sentencing purposes, of an affirmative

finding of fact that the defendant was reasonably provoked to passion and killed before reason had sufficient time to regain its sway.") (emphasis added).

We made that statement in the context of rejecting the defendant's argument that the jury's finding of passion-provocation manslaughter automatically meant the judge must find mitigating factor three applied because that would be double counting of mitigating factors. Id. at 372–73; see N.J.S.A. 44-1(b)(3) (the defendant acted under a strong provocation). Moreover, the facts of Teat, which involved the defendant's vicious thirty-minute fatal beating of his girlfriend and subsequent two-hour wait to call for medical assistance, fully supported the judge's finding of aggravating factor one. Id. at 371. In short, Teat had little application to the facts of this case, and there are no other factors on the record before us that would support a finding of aggravating factor one.

While the sentence the judge imposed might otherwise be supported by the remaining aggravating factors, we will not presume that to be the case. It is clear from the sentencing transcript that the judge placed significant emphasis on aggravating factor one. As a result, we vacate the sentence imposed and remand the matter to the judge for re-sentencing anew without application of aggravating factor one. We do not opine on an appropriate sentence.

Affirmed in part, reversed in part.  We vacate defendant's sentence and remand to the trial court for resentencing in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5290-17T1